Robert C. LaFLEUR, President, Spectra Environmental Group, Inc. on behalf of Kathleen and Campbell House, in their individual capacities and as trustees of Campbell Plaza Shopping Center and Susan Cohen, Petitioners,

v.

Christine Todd WHITMAN, in her capacity as Administrator of the United States Environmental Protection Agency and United States Environmental Protection Agency, Respondents,

Pencor–Masada Oxynol, LLC, Intervenor.

Docket No. 01–4126.

United States Court of Appeals, Second Circuit.

Argued: May 16, 2002.

Decided: July 31, 2002.

Kevin C. Murphy, Devorsetz, Stinziano, Gilberti, Heintz & Smith, Syracuse, New York (Kevin J. Brown and Gregory M. Brown, on the brief), for Petitioners.

Thomas L. Sansonetti, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C. (Daniel

M. Flores, Environmental Defense Section, United States Department of Justice, and Malcolm Woolf, Office of General Counsel, United States Environmental Protection Agency, on the brief), for Respondents.

Jonathan S. Martel, Arnold & Porter, New York, New York (Michael B. Gerrard, Monica Jahan Bose, Aruna K. Boppana, on the brief), for Intervenor.

Before OAKES and KATZMANN, Circuit Judges, and MURTHA, Chief District Judge.*

KATZMANN, Circuit Judge.

Intervenor Pencor–Masada Oxynol, L.L.C. ("Masada") seeks to construct and operate a facility in Middletown, New York, that promises to convert municipal waste and sewage sludge into fuel-grade ethanol and carbon dioxide ("the facility" or "the Masada facility."). Petitioners Robert C. LaFleur and Susan Cohen bring the instant petition under provisions of the Clean Air Act ("CAA"), see 42 U.S.C. § 7401 et seq., seeking review of the decision of respondent Christine Todd Whitman, as Administrator of the United States Environmental Protection Agency ("EPA"), not to object to the issuance of an operating permit to Masada by the New York State Department of Environmental Conservation ("NYSDEC"). At issue is whether the heightened permitting requirements of the CAA's Program for the Prevention of Significant Deterioration of Air Quality (the "PSD program") are applicable to the Masada facility. NYSDEC concluded that the PSD program was not applicable and the Administrator agreed. Petitioners contend that the Administrator's decision rests on (a) her improper classification of the facility's primary activity as "refuse processing" rather than "chemical processing," which has the effect of raising the threshold (in terms of the quantity of pollutant emitted per year) for the applicability of the PSD program; (b) her improper allocation of certain of the facility's emissions to the activity of refuse processing; and (c) her failure to consider important factors relevant to the facility's classification.

## I. Background

In September 1994, the City of Middletown, New York sought proposals for a solid waste management facility to meet its waste disposal needs following the closure of local and county landfills, and to avoid the rising costs of disposal at private landfills. The planned facility was to be constructed on the site of the former Middletown landfill—a twenty-two acre parcel of land adjacent to the City's wastewater treatment plant. The City eventually accepted Masada's proposal to construct a first-of-its-kind facility that would convert the cellulose component of sewage sludge and municipal garbage into ethanol and carbon dioxide using concentrated sulfuric acid. Masada projected that the facility could process 230,000 tons per year ("tpy") of solid waste and 49,000 tpy of sewage sludge, producing approximately 7.1 million gallons of ethanol from these and other waste inputs.

### A. Operation of the Facility

The parties do not dispute the basic outline of the planned facility's design and operation. The waste conversion process begins with the off-loading of solid waste from garbage trucks onto the facility's "tipping floor." (Only municipalities and

---

* The Honorable J. Garvan Murtha, Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

private companies that enter into contracts with Middletown and pay so-called "tipping fees" will be allowed to off-load their garbage.) From the "tipping floor," the garbage is put through a series of mechanical and manual steps to separate out the bulk of the recyclable materials, such as metals, glass, plastics, and paper. Other "unacceptable materials" are also removed and sent for off-site disposal. The remaining garbage is shredded and passed through a magnet to remove additional metals. This "feedstock" is then shredded once more, dried, and transported to the "process building." There, the feedstock undergoes an "acid hydrolysis" process during which it is mixed with concentrated sulfuric acid, which breaks down the cellulose in the feedstock and transforms it into a "slurry" of liquid sugar and acid. Sewage sludge is added to the slurry and the mixture is "cooked" to further convert cellulose into simple sugars. Separators divide the liquid portion of the slurry from the solids. Masada terms the remaining solid residue "lignin," which consists mainly of cellulose that cannot be hydrolized and acidified biosolids from the sewage sludge.

The lignin is sent to the facility's "gasifier," where it is burned as a fuel to produce steam energy. Most, if not all, the steam energy generated by the gasifier is used to power the steps necessary for the production of ethanol and carbon dioxide at the facility. A separate "package-boiler," fired by natural gas, is also employed to further meet the facility's energy demands.

While the lignin is separated and burned off in the gasifier, the remaining slurry is fed into an "ion exclusion unit," which separates out the liquid sugar from the sulfuric acid. After separation, the acid is reconcentrated by evaporation and reused for hydrolysis of the feedstock. The remaining sugar solution is treated with lime (calcium carbonate). This neutralizes any remaining acids and causes heavy metals in the solution to precipitate as gypsum, which can be processed and sold. The sugar solution is then fermented into ethanol and carbon dioxide. The latter is collected, processed, and sold, while the ethanol (contained in the form of a "mash") is distilled to achieve market-grade purity. Finally, gasoline is added to the ethanol, ensuring that it is unfit for human consumption.

## B. Regulatory Context

The CAA mandates that EPA promulgate National Ambient Air Quality Standards ("NAAQS") for certain pollutants. See 42 U.S.C. § 7409. State governments, in turn, have the opportunity to establish and administer permitting programs, subject to EPA oversight, that will ensure that the NAAQs are achieved and maintained. See 42 U.S.C. § 7410(a)(2)(C). The CAA and its implementing regulations provide a number of avenues for public participation in this regulatory process. See, e.g., 42 U.S.C. § 7409(a)(1)(B) (allowing for public comment on NAAQS); 42 U.S.C. § 7410(a)(1) (providing for "reasonable notice and public hearings" on state implementation plans); 40 C.F.R. § 70.8(d) (allowing for petitions to EPA to object to issuance of permits by states).

### 1. The PSD Program

In 1977, Congress amended the CAA and its implementing regulations to establish the PSD program, which seeks to prevent the significant deterioration of air quality in areas of the country that have achieved the NAAQS. See Richard L. Revesz, *Federalism and Environmental Externalities*, 144 U. Pa. L.Rev. 2341, 2347–49 (1996) (explaining the specific components of the PSD program). In such areas, the PSD program imposes stringent

controls on the construction or modification of "major" stationary sources of pollution. *See* 42 U.S.C. § 7475; 40 C.F.R. § 52.21. Before a permit for construction or modification of a new "major" stationary source can issue, the applicant must conduct detailed analyses of the potential impact of the source on air quality and the surrounding environment, *see* 40 C.F.R. § 52.21(k)-(*o*), and apply the best available control technology ("BACT") for each regulated pollutant that the source "would have the potential to emit in significant amounts." 40 C.F.R. § 52.21(j)(2). The PSD program also provides for public participation. *See* 40 C.F.R. § 52.21(q).

A source of air pollution may be classified as "major" for purposes of the PSD program in one of two ways. *First*, the CAA and its implementing regulations specifically identify 28 categories of stationary sources as "major" if they have the potential to emit 100 tpy or more of a regulated pollutant. 42 U.S.C. § 7479(1); 40 C.F.R. § 52.21(b)(1)(i)(a). This set of categories includes "chemical process plants." *Id.* *Second*, even if a stationary pollution source does not fall under one of the aforementioned categories, it will nevertheless be deemed "major" if it emits, or has the potential to emit, 250 tpy or more of any air pollutant regulated under the CAA. *See* 42 U.S.C. § 7479(1); 40 C.F.R. § 52.21(b)(1)(i)(b).

### 2. The Primary Activity Test & Embedded Sources

A facility that produces air pollution may often be engaged in multiple activities that, if considered separately, would fall under different categories for purposes of the PSD program. In order to categorize such complex sources of air pollution, EPA looks to the "primary activity" of the facility in question. *See* 45 Fed.Reg. 52,676, 52,695 (Aug. 7, 1980). If the primary activity is one that falls under one of the twenty-eight kinds of "major source" specifically identified by the CAA, the lower 100 tpy threshold will apply; otherwise the "default" 250 tpy threshold obtains. *See* 40 C.F.R. § 52.21(b)(1)(i)(a), (b). In determining the primary activity of a facility, EPA's stated policy is to follow the guidelines set forth in the Office of Management and Budget's *Standard Industrial Classification Manual* ("*SIC Manual*"). *See* 45 Fed.Reg. 52,676, 52,695 (Aug. 7, 1980). ("EPA has chosen the classification code in the Standard Industrial Classification Manual, 1972, as amended in 1977 ... because it is both widely-known and widely used."); *see also* 40 C.F.R. § 52.21(b)(6) (explaining that "[p]ollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same 'Major Group' (*i.e.*, which have the same first two digit code) as described in the [SIC] Manual.")

The *SIC Manual* advises that "[e]ach operating establishment is assigned an industry code on the basis of its primary activity, which is determined by its principal product or group of products produced or distributed, or services rendered." Office of Management and Budget, *SIC Manual* 15 (1987). Although the *SIC Manual* suggests that "[i]deally, the principal product or service should be determined by its relative share of value added at the establishment," it recognizes that "it is rarely possible to obtain this measure for individual products or services." *Id.* The *SIC Manual* therefore suggests other criteria that "may be expected to give approximately the same results in determining the primary activity of an establishment." *Id.* For activities involving manufacturing, the *SIC Manual* identifies the relevant "data measure" as the "[v]alue of production," whereas for services, it is the "[v]alue of receipts or revenues." *Id.* at 16.

Even where the primary activity of a multi-purpose facility places it within the default 250 tpy applicability threshold, EPA may determine that the facility contains an "embedded" source of air pollution that must be classified separately under the PSD program. *See* U.S. EPA Office of Air Quality Planning and Standards, New Source Review Workshop Manual, Draft at A 23 (October 1990). It is the policy of EPA that if the embedded source involves the kind of activity that is subject to the 100 tpy applicability threshold, and if that source emits more than 100 tpy of a regulated air pollutant, the embedded source will be subject to PSD requirements, even if the facility as a whole is not. *See, e.g.,* Letter from Edwin Erickson, EPA Region 3 Regional Administrator, to George Clemon Freeman, Jr., 4 (July 6, 1992), *available at* http://www.epa.gov/rgytgrnj/programs/artd/air/nsr/nsrmemos/primact.pdf.

### 3. Title v. Requirements.

Title V of the CAA, *see* 42 U.S.C. §§ 7661–7661f, requires that states develop, and submit for EPA approval, operating permit programs for certain stationary sources of air pollution. *See* 42 U.S.C. § 7661a(d)(1). Although these operating permit programs do not impose new substantive air quality control requirements, the permits themselves must include limitations on emissions and other conditions (such as regular monitoring, recordkeeping, and reporting) necessary to ensure compliance with the provisions of the CAA, including the PSD program (if applicable). *See* 42 U.S.C. §§ 7661a(a), 7661c(a); 40 C.F.R. §§ 70.1(b), 70.2. As EPA has explained, "[o]perating permit programs are intended to consolidate into single federally enforceable documents all requirements of the [CAA] that apply to individual sources [of air pollution]." 66 Fed.Reg. 63,180, 63,180 (Dec. 5, 2001). EPA granted interim approval to New York's operat-

ing permit program in 1996, *see* 61 Fed. Reg. 57,589 (Nov. 7, 1996), and gave full approval in 2001. *See* 66 Fed.Reg. 63,180 (Dec. 5, 2001).

### 4. Review of State Permitting Decisions

Each Title V operating permit that a state proposes to issue must be submitted to EPA for review, following the close of public commentary on the draft permit. *See* 42 U.S.C. § 7661d(a); 40 C.F.R. § 70.8(a). EPA may object to the issuance of a permit within 45 days of submission if the Administrator determines that the permit is "not in compliance with the applicable requirements of [the CAA]." 42 U.S.C. § 7661d(b)(1). If the Administrator does not object in writing, "any person" may petition the Administrator to object to the permit. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. § 70.8(d). The Administrator must issue a timely objection if "the petitioner demonstrates to the Administrator that the permit is not in compliance with the requirements of [the CAA], including the requirements of the applicable implementation plan." 42 U.S.C. § 7661d(b)(2). The Administrator's denial of a petition to object is subject to judicial review through a petition for review filed in the appropriate Court of Appeals. *See id.; see also* 42 U.S.C. § 7607(b)(1).

### C. The Petitioners

Petitioner LaFleur is the President of Spectra Environmental Group, Inc. ("Spectra"). He brings the instant petition for review "on behalf of Kathleen and Campbell House, in their individual capacities and as trustees of Campbell Plaza Shopping Center." The Houses retained Spectra, an environmental consulting firm, to assist them in challenging the construction of the Masada facility under state and federal environmental regulations. The

Campbell Plaza Shopping Center lies adjacent to the proposed site of the facility. Petitioner Susan Cohen lives a few blocks away from the proposed site and works at the Campbell Plaza Shopping Center.

### D. Previous Proceedings

It is undisputed that the Masada facility will be a new stationary source of air pollution that requires a Title V operating permit from NYSDEC. Masada applied for the required permit in December 1998.

### 1. NYSDEC Permit Decision

Masada's initial permit application, dated December 15, 1998, identified the primary activity of its proposed facility with SIC codes 2869 (Industrial Organic Chemical Processes) and 4953 (Refuse Systems). In a revised application, dated August 6, 1999, Masada changed its SIC classification, dropping the chemical processing code.

NYSDEC granted Masada's application and issued a final version of the Title V permit on July 25, 2000, after consulting with EPA and receiving public commentary. NYSDEC determined that the facility should not be subject to the requirements of the PSD program. As explained by NYSDEC in responding to the public commentary it received, its decision was based on conclusions that (a) the primary purpose of the Masada facility was municipal solid waste processing, and (b) the emissions from the gasifier and package boiler were not attributable to the chemical processing activities of the facility. See NYSDEC, Responsiveness Summary, Response to the March 31, 2000 Spectra Comments, 1 (May 4, 2000).

### 2. Initial Position of EPA During NYSDEC Deliberations

During the course of its evaluation of Masada's permit application, NYSDEC conferred with various officials from EPA's Region 2 office in New York ("EPA Region 2") on the question of the applicability of the PSD program to the facility. On March 11, 1999, NYSDEC informed EPA by letter that it had determined, "based on project information and the [SIC] code provided by [Masada]," that the facility would be subject to the default 250 tpy threshold because the primary activity of the facility would be refuse processing. See Letter from Robert J. Stanton, Regional Air Pollution Control Engineer for NYSDEC, Division of Air Resources, Region 3, to Steven Riva, Chief of the Permitting Section, Air Programs Branch, U.S. EPA Region 2, at 1 (Mar. 11, 1999). In response, EPA Region 2 pointed out that NYSDEC had previously informed EPA (orally) that there was an embedded "chemical process plant" within the facility that was capable of producing more than 100 tpy of a regulated pollutant. See Letter from Steven C. Riva to Robert J. Stanton, 1 (Mar. 25, 1999). EPA Region 2 instructed NYSDEC that, under EPA's "agency-wide policy," such an embedded source would be subject to PSD program requirements "even if that source is located within a facility for which the primary activity is subject to a 250[tpy] applicability threshold and emits less than 250[tpy]." Id. at 2.

In May 1999, before NYSDEC's final decision was announced, representatives of Masada met with EPA and NYSDEC officials to discuss the classification of the facility. Masada argued again that the primary purpose of the facility was not chemical processing, but waste processing. As Masada explained in a follow-up letter to EPA Region 2, the "tipping fees" to be generated by the facility were expected to account for more than 70 percent of the facility's expected revenue, whereas less than 30 percent of revenue would be de-

rived from the sale of the ethanol produced from municipal waste. *See* Letter from Jonathan S. Martel, Counsel for Masada, to Steven C. Riva, 3 (May 6, 1999). With regard to EPA's specific concern about the gasifier's emissions, Masada explained that these emissions resulted from the burning (or "gasification") of the lignin remaining after the acid hydrolysis step. Masada stated that "[c]onsidering the revenue streams for this facility, the principal economic value of the lignin gasifier is to eliminate the lignin, thereby avoiding the need to pay for its landfill disposal." *Id.* at 5. Masada argued that, therefore, the gasifier and its emissions were part of the primary activity of refuse processing.

EPA Region 2 concluded that more information was necessary before a final decision could be made, and directed that NYSDEC "not release the final Title V permit to Masada unless and until significant issues regarding the applicability of the [PSD] regulations ... are resolved." Letter from Steven C. Riva to Michael Merriman, NYSDEC Division of Environmental Permits, Region 3 Office, 1 (Oct. 20, 1999). EPA sought specific information from Masada relevant not only to PSD classification, but to other technical questions. *See id.,* Attachment, EPA Comments on Pencor Masada Oxynol, L.L.C.'s Draft Title V Permit, 1–10.

### 3. *EPA Changes Course*

On November 2, 1999, Masada responded to EPA's inquiries in a letter to NYSDEC. With regard to EPA's concerns over the applicability of the PSD program, Masada repeated its earlier claim that the facility's primary activity was not chemical processing, adding that the facility was a "unique and innovative refuse processing plant that does not fit into a regulatory foundation laid over 20 years ago." Letter from David J. Weber, Project Manage-

ment, Masada, to Robert J. Stanton, NYS-DEC, 2 (Nov. 2, 1999). Masada stated that because lignin is produced by the hydrolysis of municipal solid waste, it should not be considered the byproduct of the facility's ethanol production process. *See id.,* Attachment, Response to EPA Region 2 Questions Regarding the Masada Oxynol Facility, 12. Masada also repeatedly denied that lignin itself was a waste product. *See id.* at 3, 12. Other than these assertions, however, Masada did not provide any further explanation as to why the gasifier and its emissions should be considered part of the facility's refuse processing activities, rather than its chemical processing activities, for purposes of the PSD program. *See id.* Instead, Masada asserted that because the primary activity of the facility was "clearly refuse processing," this "eliminate[d] by definition a large number of the comments contained in Region 2's October 20 letter." *Id.,* Letter of David J. Weber, at 1.

On December 6, 1999, Kathleen Callahan, the Director of EPA Region 2's Division of Environmental Planning and Protection, notified NYSDEC that EPA Region 2 had changed its initial assessment, stating that in light of Masada's letter of November 2, 1999, it now had "enough information" to make a final determination as to the classification of the facility. *See* Letter from Kathleen C. Callahan, Director of EPA Region 2 Division of Environmental Planning and Protection, to Robert K. Warland, Director, NYSDEC Division of Air Resources, 1 (Dec. 6, 1999). In supporting EPA Region 2's determination that "[the facility] is primarily a municipal waste collection and processing plant," Callahan cited the fact that "[w]aste collection and processing is the purpose of the contractual agreement between Masada, the city of Middletown and surrounding towns." *Id.* Callahan also cited the 70/30 split in pro-

jected revenue between tipping fees and sale of ethanol as further support for the determination that the primary activity was refuse processing. *Id.* at 1 2. In addition, Callahan argued that "[b]y processing the waste in the manner proposed, disposal in landfills is minimized and incineration is avoided." *Id.* at 2. As for the emissions from the gasifier and package boiler, Callahan explained that EPA policy "provides that an emission unit serving as a support facility for two activities or sources is to be considered part of the activity that relies most heavily on its support." *Id.* Callahan concluded that most of the steam produced by the gasifier and package boiler supported the "hydrolysis/cooking step, which is important for breaking down the municipal solid waste into reusable components." *Id.* Although the hydrolysis/cooking step could be considered part of the ethanol production process, Callahan stated that EPA Region 2 had determined that "the step more appropriately belongs with the waste processing aspect." *Id.* Callahan further explained that once the hydrolysis/cooking step was counted as part of the facility's waste processing activities, more than 80 percent of the steam produced by the gasifier and package boiler would have to be considered as supporting waste processing. Accordingly, under the support facility approach, the gasifier and package boiler were not "a primary part of the embedded chemical process plant." *Id.*

#### 4. Spectra's Petition to Object

After NYSDEC issued its final permit to Masada, EPA did not object to the permit within the 45–day period specified by the CAA. EPA then received 35 petitions from 29 different petitioners, requesting EPA to object to the issuance of the permit. Spectra submitted the most detailed petition, under the signature of its president Robert Lafleur, but "on behalf of" Campbell Plaza, petitioners Susan Cohen and Kathleen House, as well as other, unnamed individuals (the "Spectra petition"). The Spectra petition argued, *inter alia,* that (a) NYSDEC's decision, and EPA's change of opinion, were motivated by political, rather than scientific, considerations; (b) the primary activity of the plant was chemical processing, not waste disposal, because the plant used waste only as an ingredient in the production of ethanol, thus "converting" waste rather than "disposing" of it; (c) most of the personnel and payroll at the facility would be dedicated to chemical processes; and (d) the gasifier's emissions should be counted as part of the chemical processing activity of the facility, thereby triggering the requirements of the PSD program, because the gasifier supported the production of ethanol by eliminating the residue (lignin) that resulted from that process.

#### 5. The Administrator's Decision

In response to the Spectra petition and others, the Administrator issued a lengthy opinion that concluded, *inter alia,* that petitioners had failed to carry their burden of showing that the requirements of the PSD program were applicable to the facility. *See* Order Responding to Petitioner's Request that the Administrator Object to Issuance of a State Operating Permit, Petition No. II–2000–07 (May 2, 2001) (hereinafter "EPA Order").

#### a. The Primary Activity of the Facility

The Administrator determined that the Spectra petition did not demonstrate that the facility's primary activity was chemical processing. The Administrator explained that when determining the primary activity of a complex industrial facility, the permitting authority "should consider the facility's operation as a whole." EPA Order,

at 14. In this instance, a number of factors supported a determination that the primary activity of the facility was refuse processing, "including the relative share of the value of services rendered compared to the products sold, and the contractual relationship between the facility and Middletown and neighboring communities." *Id.* The Administrator specifically referred to Masada's assertion that 70 percent of its revenue would be derived from tipping fees paid by municipalities for disposal of their waste, whereas only 30 percent would come from the production of ethanol, carbon dioxide, and other outputs. *See id.* at 16. The Administrator found these figures reliable, on the assumption that "the rather large 70–30 dominance of tipping fees in the revenue estimate ... provides reasonable certainty that the majority of the revenue from Masada will come from tipping fees." *Id.* The Administrator also concluded that "[a]lthough the production of ethanol may be integrated into the disposal facility to make the waste disposal more cost-effective ... the facility is being built primarily to fulfill these municipalities' need to dispose of solid waste." *Id.* at 15. Furthermore, the Administrator found that "[n]either the mere presence of chemical processing activity nor the mere production of chemical by-products is sufficient to determine the source's primary activity." *Id.* Finally, the Administrator rejected petitioner's argument that waste "disposal" was not accomplished by the facility, but waste "conversion." The Administrator found that "[t]he semantic difference between 'disposal' and 'conversion' has no regulatory consequence, because both are methods of minimizing solid waste, and both occur at the Masada facility." *Id.* at 16.

### b. Attribution of Emissions from the Gasifier

The Administrator agreed with petitioners that there was, indeed, an embedded "chemical process plant" at the Masada facility, specifically, those components dedicated to production of ethanol. *See id.* at 18. Reversing an earlier determination by EPA Region 2, the Administrator concluded that the hydrolysis/cooking step was part of this embedded chemical process plant, which also encompassed the production steps of sugar/acid separation, acid reconcentration, fermentation, and distillation. *See id.* Furthermore, the Administrator determined that the package boiler existed "primarily to supply energy needed to reconcentrate the acid for hydrolysis." *Id.* Nevertheless, the Administrator concluded that the emissions from the gasifier should not be attributed to chemical processing, but rather to the facility's refuse system operations. In making this determination, the Administrator stated:

> [T]he primary activity of the Masada facility is refuse processing, and the gasifier, by substantially reducing the volume of the lignin, is primarily performing a refuse processing function. Even if the energy is recovered from gasification/combustion as a side benefit and used for ethanol production, and even if the presence of a waste stream and integrated disposal process makes ethanol production economical at this site, this does not change the determination that the primary activity is refuse processing.

*Id.* at 19. The Administrator also rejected the petitioners' argument that the gasifier was a "support system" for the production of chemicals. Once again departing from an earlier determination by EPA Region 2, the Administrator concluded that "the support facility test is not relevant to the Masada facility because there is no question that the chemical processing activities and the waste reduction activities at [the] Masada facility are a single source [of air

pollution]." *Id.* The support facility test, the Administrator explained, is only applicable where two separate sources of pollution are at issue, rather than a two interconnected sources co-existing within the boundary of a single facility: "The support facility test is not used to evaluate embedded sources." *Id.*

### 6. Petitioner's Article 78 Proceeding

In addition to filing their administrative petition with EPA, petitioner Susan Cohen, as well as Kathleen and Campbell House, brought an Article 78 proceeding against NYSDEC and Masada in the Supreme Court of New York, Albany County.[1] That proceeding, initiated on September 22, 2000, included a claim that the permit issued by NYSDEC violated the CAA because it did not apply the PSD program requirements to the facility as a "chemical process plant." The state court rejected this claim and no appeal was taken by the petitioners.

## II. Discussion

After the issuance of the EPA Order, Robert LaFleur and Susan Cohen filed the instant petition for review, pursuant to the judicial review provisions of the CAA. *See* 42 U.S.C. §§ 7607(b)(1); 7661d(b)(2). These provisions do not set forth a separate standard of review. *See* 42 U.S.C. § 7607. We must therefore evaluate the Administrator's actions under the standard established by the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706. The EPA Order must be upheld if the Administrator's decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although our review under this standard is "narrow," the administrative agency must nevertheless "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal quotation omitted). In evaluating the agency's explanation, we cannot substitute our preferences for that of the agency, but must limit our review "to examining the administrative record to determine whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Natural Res. Def. Council, Inc. v. Muszynski,* 268 F.3d 91, 97 (2d Cir.2001) (internal quotation omitted). We may set aside an agency determination as arbitrary and capricious if we conclude that the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856.

### A. Claims on Review

Petitioners make three main arguments for reversal of the EPA Order. *First,* they contend that the Administrator improperly weighed the evidence in deter-

---

1. Intervenor Masada brought a motion before this Court to take judicial notice of the state court record of the Article 78 proceeding, which we granted. *See Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir.1992) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (internal quotation omitted).

mining that the "primary activity" of the facility was refuse processing rather than chemical processing. Specifically, petitioners argue that (a) the Administrator's decision had no rational connection to her findings that most of the facility's activities were devoted to the chemical processing activity of ethanol production, rather than refuse processing, (b) the Administrator's reliance on Masada's revenue projections was improper because the basis for these projections was not examined, and (c) it was not rational for the Administrator to depart from EPA's past practice of classifying ethanol-production facilities as chemical process plants simply because the Masada facility uses municipal waste, rather than corn, as its "feedstock."

*Second,* petitioners describe as "ill-founded" the Administrator's conclusion that, despite the presence of an "embedded" chemical process plant at the Masada facility, the PSD requirements do not apply because emissions from this embedded source will not exceed the 100 tpy threshold. Petitioners contend that it was an abuse of discretion for the Administrator to reach this determination by excluding the gasifier's emissions from the total emissions of the embedded chemical process plant, particularly in light of the uncontested fact that most of the steam power from the gasifier will be used in ethanol production, and that the use of lignin as a fuel (as opposed to natural gas or other fuel sources) will make the ethanol production process more cost effective. Moreover, petitioners suggest that lignin cannot be considered a "waste product," but is, in reality, a saleable fuel source. According to petitioners, these factors clearly indicate that the gasifier and its use of lignin contribute to ethanol production and that the gasifier's emissions cannot be rationally allocated towards refuse processing.

*Third,* petitioners contend that the Administrator failed to consider important factors in making its determination not to object to the State's issuance of the Title V permit. Specifically, petitioners argue that the Administrator did not consider (a) "relative value added" in determining whether the primary activity of the facility was refuse processing or chemical processing; (b) information found in publicly available patents held by Masada; and (c) the possibility of classifying the facility as containing two separate kinds of pollution sources.

In response to petitioners' claims, EPA argues that petitioner LaFleur does not have standing to petition this Court, either on his own behalf or on behalf of Kathleen and Campbell House. Intervenor Masada challenges the standing not only of petitioner LaFleur, but petitioner Cohen as well. EPA and Masada both contend that the doctrine of collateral estoppel also bars review of the EPA Order. Finally, in the alternative, EPA and Masada argue that the Administrator did not abuse her discretion in refusing to object to NYSDEC's issuance of the Title V permit.

### B. Standing of the Petitioners

█ We must first address petitioners' standing. *See, e.g., United States v. $557,933.89, More or Less, in U.S. Funds,* 287 F.3d 66, 78 (2d Cir.2002) ("Standing is a question that determines whether the claimant may properly invoke the jurisdiction of the federal courts to determine the merits of the underlying dispute, and it therefore logically *precedes,* not follows, that determination."). Petitioners bear the burden of alleging facts that demonstrate their standing because it is they who seek to invoke the jurisdiction of this Court. *See Thompson v. County of Franklin,* 15 F.3d 245, 249 (2d Cir.1994).

Three elements comprise the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). *First*, the party seeking judicial resolution of its claim "must have suffered an injury-in-fact-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotations and citations omitted). A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Id.* at 560 n. 1. *Second*, there must be "a causal connection between the injury and the conduct complained of." *Id.* at 560, 112 S.Ct. 2130. *Third*, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561, 112 S.Ct. 2130 (internal quotation omitted).

### 1. Standing of Petitioner LaFleur

■ As noted previously, LaFleur is the President of Spectra—an environmental consulting firm that the Houses have retained for assistance in challenging the construction of the facility. LaFleur has not alleged any facts to establish that he has suffered the required injury-in-fact. Indeed, it is obvious that, as a hired consultant of the Houses, without a personal stake in the outcome of this petition, LaFleur cannot show the kind of "particularized" harm necessary to satisfy the constitutional requirements of standing.[2] We must therefore dismiss LaFleur as a peti-

tioner. Although it may have been inadvertence that caused LaFleur to name himself as a petitioner, rather than the Houses, it is a mistake that we cannot overlook, given the jurisdictional nature of the standing requirement. As the Supreme Court has explained, "[t]he requirement that jurisdiction be established as a threshold matter 'spring[s]' from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884)). It follows that the Houses are not parties to this proceeding because they have not filed a petition for review.[3]

### 2. Standing of Petitioner Cohen

Intervenor Masada challenges the standing of petitioner Cohen,[4] arguing that she has failed to allege that the increase in air pollutant emissions from the facility would affect her negatively in any way, and thus has not alleged the necessary injury-in-fact. Masada asserts that its own Air Quality Modeling Report, submitted to NYSDEC for its review, shows that even assuming a "worst case" impact of the facility, the ambient level of the regulated air pollutant to be released by the facility, namely, sulfur dioxide ($SO_2$), would be well below the applicable NAAQS. As Masada points out, the CAA mandates that EPA

---

**2.** Along with the constitutional requirements of standing, there are additional prudential limitations on the ability of parties to invoke the jurisdiction of federal courts. One of these limitations is that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). This, too, is an obstacle to LaFleur's standing in this case.

**3.** The Houses cannot now file a petition for review of the EPA Order. The time limit on such a petition has long since passed. *See* 42 U.S.C. 7607(b)(1).

**4.** EPA does not join in this challenge to petitioner Cohen's standing.

establish NAAQS that, "allowing an adequate margin of safety, are requisite to protect the public health." 42 U.S.C. § 7409(b)(1). Masada suggests that because the NAAQS will not be exceeded, petitioner Cohen cannot establish the injury requisite for Article III standing.

■ We disagree. Petitioner Cohen has alleged that she works in a shopping center adjacent to the proposed site of the facility, and lives a few blocks away. Although the proposed site of the facility is a former landfill and adjacent to Middletown's sewage treatment plant, and thus has doubtful recreational value to petitioner Cohen, there can be no question that petitioner Cohen is likely to be exposed to emissions from the facility. She has no choice but to breathe the air where she lives and works-air that will undoubtedly contain increased levels of $SO_2$ whenever the wind blows the facility's emissions in the direction of Campbell Shopping Plaza.[5] As described by one of our sister circuits, sulfur dioxide is "[a] highly reactive colorless gas smelling like rotten eggs" that "at elevated concentrations in the ambient air ... directly impairs human health." *American Lung Ass'n v. EPA*, 134 F.3d 388, 389 (D.C.Cir.1998). Petitioner's likely exposure to additional $SO_2$ in the air where

she works is certainly an "injury-in-fact" sufficient to confer standing. *Cf., e.g., Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir.2001) ("To allege a legally protected, concrete aesthetic interest, a plaintiff must show merely that the challenged action affects his aesthetic or ecological surroundings."). This exposure will affect petitioner Cohen in the required "personal and individual way." *Lujan*, 504 U.S. at 560 n. 1, 112 S.Ct. 2130.

■ Petitioner Cohen has Article III standing even if the ambient level of $SO_2$ remains within the NAAQS.[6] Indeed, Congress has recognized that there are potentially adverse affects from air pollution at levels *below* the NAAQS. The CAA states specifically that one of the purposes of the PSD program is "to protect public health and welfare from any actual or potential adverse effect which ... may reasonably be anticipated to occur from air pollution or from exposures to pollutants in other media ... *notwithstanding attainment and maintenance of all national ambient air quality standards.*" 42 U.S.C. § 7470(1) (emphasis added). The injury-in-fact necessary for standing "need not be large, an identifiable trifle will suffice." *Sierra Club v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 557 (5th

5. During the review process, EPA Region 2 concluded, based on information submitted by Masada, that the facility had the potential to emit 247 tpy of $SO_2$—just slightly below the default applicability threshold for the PSD program. *See* Letter of Kathleen C. Callahan to Robert K. Warland, *supra*, at 2. This estimate is not controverted by the parties here.

6. Masada relies nearly exclusively on *Ogden Projects, Inc. v. New Morgan Landfill Co., Inc.*, 911 F.Supp. 863 (E.D.Pa.1996). That case involved claims, *inter alia*, that the failure of EPA to apply specific regulations to a landfill site resulted in worse air quality in the area surrounding the landfill than would have existed had the regulations been enforced. Although the district court demanded a showing

of the "magnitude of the diminished air quality" and "the specific direct effect, if any, that this diminished air quality will have on [plaintiffs'] health, environmental and recreational interests," *id.* at 869, the case did not turn on whether the area in question had attained the NAAQS or whether the increased air pollution exceeded those standards. Moreover, the plaintiffs in that case lived 25 miles and 85 miles respectively from the landfill in question, *see id.*, and thus did not face the type of direct and unavoidable exposure to increased emissions that confronts petitioner Cohen here. *Ogden* is thus easily distinguishable from the instant case, and we need not express any opinion as to the merits of that decision.

Cir.1996) (internal quotation omitted); *see also Conservation Council of North Carolina v. Costanzo,* 505 F.2d 498, 501 (4th Cir.1974) ("The claimed injury need not be great or substantial; an identifiable trifle, if actual and genuine, gives rise to standing.") (internal quotation omitted). Actual exposure to increased levels of $SO_2$ at one's workplace is certainly something more than an "identifiable trifle," even if the ambient level of air pollution does not exceed the NAAQS.

Finally, in complaining that the requirements of the PSD program should have been applied to the Masada facility, petitioner Cohen has alleged the type of procedural injury that may confer Article III standing on certain plaintiffs. As petitioner Cohen notes, the PSD program contains provisions for additional environmental impact studies and further public commentary, over and above what is otherwise required under the CAA. The determination that the PSD program does not apply to the Masada facility means that petitioner Cohen will not have the benefit of these additional procedures. Thus she stands in a similar position to the hypothetical plaintiff described in *Lujan:* "[U]nder our case law, *one living adjacent* to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement." 504 U.S. at 573 n. 7, 112 S.Ct. 2130 (emphasis added). Although petitioner Cohen does not live next door to the proposed site of the Masada facility, the fact that she *works* next door to it confers no less standing to seek the protection of all applicable procedures and regulations. We therefore reject Masada's contention that petitioner Cohen lacks standing to invoke judicial review of the EPA Order.

### C. Collateral Estoppel

As an additional argument against consideration of the instant petition for review, Masada and EPA contend that, in light of the previous Article 78 proceeding initiated by petitioner Cohen and the Houses, the doctrine of collateral estoppel bars review.

### 1. Collateral Estoppel in New York

 A federal court must apply the collateral estoppel rules of the state that rendered a prior judgment on the same issues currently before the court, which in this case is New York. *See, e.g., Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir.2000). Under New York law, collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party ... whether or not the tribunals or causes of action are the same." *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984). New York courts apply collateral estoppel, or issue preclusion, "if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *Parker v. Blauvelt Volunteer Fire Co.,* 93 N.Y.2d 343, 349, 690 N.Y.S.2d 478, 712 N.E.2d 647 (1999). Additionally, the issue that was raised previously must be "decisive of the present action." *Schwartz v. Public Adm'r of Bronx,* 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969). The doctrine of collateral estoppel "is grounded on concepts of fairness and should not be rigidly or mechanically applied." *D'Arata v. New York Central Mutual Fire Ins. Co.,* 76 N.Y.2d 659, 664, 563 N.Y.S.2d 24, 564 N.E.2d 634 (1990); *see also Staatsburg Water Co. v. Staatsburg Fire Dist.,* 72 N.Y.2d 147, 153, 531 N.Y.S.2d 876, 527 N.E.2d 754 (1988) ("Collateral estoppel is

an elastic doctrine and the enumeration of these elements is intended as a framework, rather than a substitute, for analysis.").

### 2. The Previous New York State Proceeding Raised Identical Issues

■ The burden of proving whether an issue raised and necessarily decided in a previous proceeding is identical to one currently before the court "rests squarely on the party moving for preclusion." *Gagnier*, 225 F.3d at 166. In order to meet this burden, Masada has submitted records from the previous Article 78 proceeding in state court. A judgment pursuant to Article 78 may preclude relitigation of issues already decided in that earlier judgment. *See Genova v. Town of Southampton*, 776 F.2d 1560, 1561 (2d Cir.1985) (per curiam).

As a first cause of action in their Article 78 proceeding, the Houses and petitioner Cohen contended that the Masada facility was a "chemical process plant" and that NYSDEC had "failed to properly designate the primary activity of the facility as a chemical process plant in order to circumvent the PSD requirements codified in the federal Clean Air Act. . . ." Verified Petition/Complaint, Declaration of Jonathan S. Martel in Support of Pencor–Masada Oxynol, LLC's Motion for the Court to Take Judicial Notice of State Court Record ("Martel Decl."), Exh. 1, ¶¶ 55, 56. The Article 78 proceeding also addressed the alleged failure of NYSDEC "to properly allocate internal emissions within the facility, arbitrarily and irrationally allocating emissions from the gasifier/boiler to the waste collection function of the Chemical Plant as opposed to its primary ethanol production function." *Id.* at ¶ 57. It is on precisely these grounds that petitioner Cohen now argues that the Administrator should have objected to NYSDEC's issuance of a Title V operating permit and its

finding that the requirements of the PSD program did not apply to the facility.

The Houses and petitioner Cohen also advanced many of the same legal arguments in the Article 78 proceeding as they present to this Court now. For example, in support of their contention that the primary activity of the facility was chemical processing, the Houses and petitioner Cohen argued in state court, as they do here, that the principal product of the facility would be ethanol, regardless of the "feedstock" used, and that it was improper for NYSDEC to focus on projected revenue in determining the primary activity. *Compare* Memorandum of Law of Petitioners Plaintiffs, Kathleen and Campbell House, In Their Individual Capacities and As Trustees of the Campbell Plaza Shopping Center, and Susan Cohen ("Mem. in Support of Art. 78 Petition"), Martel Decl., Exh. 2, at 13–15, *with* Petitioner's Opening Brief in Support of Petition for Review, 23–30, 33. Additionally, in arguing that the gasifier's emissions had been misallocated, the Houses and petitioner Cohen complained that lignin "is a residue of the chemical manufacturing process [at the facility], so the emissions resulting from its disposal are attributable to the [Masada facility's] chemical processing." Mem. in Support of Art. 78 Petition, Martel Decl., Exh. 2, at 18. Moreover, the Houses and petitioner Cohen suggested that, by disposing of lignin, the gasifier "is an essential part of the overall ethanol production operation." *Id.* at 19. Again, these arguments are identical to those currently pressed by petitioner Cohen.

After briefing and oral argument, the New York Supreme Court found that "[t]he record plainly reveals that the conclusion of both DEC and EPA that the [Masada] facility was not a chemical processing plant was supported in the record by a rational basis." House v. Cahill, No.

5799–00 (N.Y.Sup.Ct., Feb. 2, 2001) (Decision & Judgment) (hereinafter "State Decision"), Martel Decl., Exh. 4, at 5. The state court also found that NYSDEC "had sufficient information to determine that the EPA PSD standards did not apply." *Id.* at 6.

■ Petitioner Cohen argues that the issues presented in the Article 78 proceeding are not identical to those before this court. Petitioner Cohen points out that in state court, she and the Houses challenged *NYSDEC's* determination to issue the Title V permit; by contrast, in the instant case, they are challenging the failure of the *Administrator* to *object* to the permit's issuance by NYSDEC. Yet, while it is true that we are reviewing the Administrator's evaluation of NYSDEC's permitting decision, rather than NYSDEC's decision itself, this distinction is one without a meaningful difference for purposes of collateral estoppel inquiry. *See Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (explaining that under the doctrine of collateral estoppel "once an *issue* is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits *based on a different cause of action* involving a party to the prior litigation." (emphasis added)). Although our inquiry is one step removed from direct review of NYSDEC action, the rationality of that action is nevertheless central to our own review of petitioner's claim that it was an abuse of discretion for the Administrator not to object to the State's issuance of a Title V operating permit. Indeed, the arguments advanced by petitioner Cohen in the state court against the NYSDEC's decision—namely, that the primary activity of the facility was chemical processing and that the gasifier's emissions should be counted as part of that activity—are the same as she presents to

us now as reasons for finding that the Administrator abused her discretion in not objecting to the issuance of the Title V permit. Thus we cannot grant the instant petition for review without directly contradicting the state court on issues it has previously decided at the behest of petitioner Cohen. It is precisely this kind of inconsistent result that the collateral estoppel doctrine seeks to avoid. *See Chartier v. Marlin Mgmt., LLC,* 202 F.3d 89, 94 (2d Cir.2000). We therefore conclude that Masada has shown the identity of issues necessary for collateral estoppel to apply.

### 3. Other Elements of Collateral Estoppel Have Been Satisfied

■ As indicated by the foregoing discussion, the record of the Article 78 proceeding discloses that the state court determined the issues before us now. The state court ruled explicitly that NYSDEC's determination that the primary activity of the facility was not chemical processing was "supported in the record by a rational basis." State Decision, Martel Decl., Exh. 4, at 5. Although the state court did not rule explicitly on the issue of whether there was an "embedded chemical process plant" at the Masada facility, it nevertheless rejected petitioner's central contention that NYSDEC had mistakenly allocated the gasifier's emissions to the activity of refuse processing, thereby circumventing the PSD requirements. *Id.* at 6. We find, therefore, that for purposes of collateral estoppel, Masada has demonstrated that the issues before us now were "necessarily decided" in the first action. *Parker,* 93 N.Y.2d at 349, 690 N.Y.S.2d 478, 712 N.E.2d 647. Moreover, it is clear that determination of the facility's primary activity and proper allocation of the gasifier emissions were "necessary to the [state] court's judgment." *Wilder v. Thomas,* 854 F.2d 605, 620 (2d Cir.1988). Again, peti-

tioner Cohen raised these issues in state court as the main grounds for her claim that the PSD requirements should apply to the facility. The state court was therefore required to reach these issues in order to determine the merit of petitioner's claim.

▮ Petitioner Cohen contends that she did not have a "full and fair opportunity" to litigate the issues before us now in state court because the Administrator was not a party to the Article 78 proceeding.[7] This argument misses the point. Our inquiry with regard to the "full and fair opportunity" prong of the collateral estoppel doctrine is whether petitioner Cohen, as the petitioner-plaintiff in the previous state court proceeding, was fully able to raise the same factual or legal issues as she asserts here—*not* whether the respondent-defendants were identical in both cases. *See Republic Gear Co. v. Borg–Warner Corp.*, 381 F.2d 551, 555 n. 1 (2d Cir.1967) (explaining that "collateral estoppel may bar relitigation of an issue even against different defendants," provided that the issue in contention was necessary to the result reached in the prior proceeding); *Israel v. Wood Dolson Co., Inc.*, 1 N.Y.2d 116, 119, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956) ("[T]he fact that a party has not had his day in court on an issue as against a particular litigant is not decisive in determining whether the defense of *res judicata* is applicable."). That the Administrator was not a party to the Article 78 proceeding is irrelevant to the question of whether petitioner Cohen was previously afforded a "full and fair opportunity" to litigate the *issues* she presents here. Petitioner Cohen has failed to carry her burden of showing that she did not have such a "full and fair" opportunity.

### 4. Binding Force of the State Court Decision

The CAA grants the Administrator authority to exercise independent oversight and judgment in responding to petitions challenging the adequacy of state permits issued under Title V. *See* 42 U.S.C. § 7661d. Additionally, the CAA provides for judicial review of the Administrator's decision through petitions for review to the appropriate federal Court of Appeals. *See* 42 U.S.C. § 7661d(b)(2). Petitioner Cohen therefore argues that the previous New York state court decision cannot be given preclusive effect because doing so would improperly allow the decision of NYSDEC, affirmed by a state court, to trump the oversight authority of the Administrator. Moreover, contends petitioner Cohen, such a result would confer authority on a state court to determine whether EPA acted within its authority under Title V—effectively circumventing federal appellate review of the Administrator's decision regarding issues already considered and rejected by the state court.

In response, EPA argues that, on the particular facts and posture of this case, application of collateral estoppel is consistent with the design of the CAA. The Administrator points out that collateral estoppel is being invoked defensively to preclude petitioner Cohen, not the Administrator, from relitigating issues that she previously brought before a state court. Pointing out that the Administrator and state court reached the same decision regarding the applicability of the PSD program, the Administrator argues that there is no threat to the independent oversight capability of EPA if collateral estoppel is applied in this case. EPA also argues that had it come to a different decision from

---

7. The burden rests with the party opposing collateral estoppel to show that it did not have a full and fair opportunity to litigate the issue

in the prior proceeding. *See Ryan,* 62 N.Y.2d at 501, 478 N.Y.S.2d 823, 467 N.E.2d 487.

the state court and *objected* to NYSDEC's issuance of a Title V permit to Masada, EPA could not be bound by the previous state court determination.

We agree with EPA that petitioner Cohen's previous state litigation in no way constrains EPA's independent review of NYSDEC's permitting decision. At the same time, however, we find troubling the possibility that the state court's determination could limit the scope of *this Court's* authority to review the Administrator's decision merely because the Administrator reached the same conclusion on the specific issues raised by a petitioner in a previous state proceeding, particularly in light of Congress's provision for federal circuit court review of the Administrator's denial of a petition to object, *see* 42 U.S.C. § 7661d(b)(2). We need not resolve that issue here because, in any event, the interests underlying the doctrine of collateral estoppel support its invocation in the case at hand. We observe that it was petitioner Cohen's choice to first seek a judicial determination in state court regarding the applicability of the PSD program requirements to the Masada facility. *Cf. Giakoumelos v. Coughlin,* 88 F.3d 56, 61 (2d Cir.1996) (noting that the plaintiff in that case "chose to litigate his claims by way of an Article 78 proceeding," and thereby assumed the risk of collateral estoppel in a subsequent proceeding "attendant to his decision to follow that route"). As we have explained previously, "[t]he doctrine [of collateral estoppel] promotes important goals: it allows a party only one opportunity to litigate an issue thereby conserving the time and resources of the parties and the court; promotes the finality of judgments; preserves the integrity of the judicial system by eliminating inconsistent results; and ensures that a party not be able to relitigate issues already decided against it in prior litigation." *Johnson v. Watkins,* 101 F.3d 792, 795 (2d Cir.1996). These interests weigh strongly in favor of requiring petitioner Cohen to be bound by the consequences of her initial choice of forum. Petitioner Cohen has had her day in court on the issue of the applicability of the PSD requirements to the facility; she cannot now gain a further opportunity to litigate this same issue.

### D. Review of EPA's Final Order

Whether or not collateral estoppel is invoked, we uphold the Administrator's decision on review of its merits. We find no reversible error in either the Administrator's determination that the primary activity of the facility is waste processing rather than chemical processing, or its conclusion that the gasifier's emissions should be allocated to that primary activity, rather than the embedded chemical process plant.

### 1. Primary Activity Determination

██ Petitioner Cohen argues that the Administrator's determination of the facility's primary activity was flawed for several reasons. We analyze each in turn.

#### a. The Predominance of Ethanol Production Steps

It is undisputed that the Administrator found that most of the activities at the Masada plant were devoted to the production of ethanol, rather than the disposal of waste. Whereas the Administrator concluded that the hydrolysis, acid reconcentration, fermentation, distillation and storage activities were related to chemical processing, only the "sorting and drying" of incoming waste and "gasification" processes were devoted to refuse processing. Simple step counting, however, does not render the Administrator's "primary activity" determination an "abuse of discretion." As EPA points out, the fact that the steps involved in the sorting and com-

bustion of waste material at the facility are less complex and involve less steam energy than ethanol production does not mean that ethanol production is the primary activity. EPA suggests that other factors must be taken into consideration, such as projected revenue from the facility's activities and the motivation behind the construction of the facility. We agree that there is nothing irrational about the Administrator's refusal to base her "primary activity" decision solely on the number of steps involved in the production of ethanol versus the sorting and combustion of waste. We therefore turn to the other factors considered by the Administrator.

### b. Reliance on Revenue Projections

Petitioner Cohen argues that the Administrator improperly relied on Masada's projection that 70% of its revenue will come from tipping fees. Petitioner Cohen finds this reliance suspect because the Administrator failed to inquire into the quality of this projection, its components, or its underlying assumptions (such as the projected price of ethanol over the next twenty years). In her decision, the Administrator justified her reliance on Masada's projections by noting that the predominance of tipping fees in the breakdown of revenue was so large that, even accounting for error, tipping fees were likely to comprise a majority of the facility's revenue. This reasoning, contends petitioner Cohen, creates incentives for permit applicants to overestimate revenue from non-chemical production components and makes the applicability of PSD safeguards subject to vagaries in the price of chemical products (such as ethanol) in the marketplace. Moreover, petitioner Cohen suggests that we owe no deference to EPA's focus on revenue projections, since this approach is not founded on any rule or regulation, but only an internal EPA policy. *See Christensen v. Harris County,* 529 U.S. 576,

587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.").

EPA argues, and we agree, that its reliance on Masada's revenue projections was proper. EPA points out that petitioners did not submit to the Administrator any alternative estimates of projected revenue, let alone provide estimates showing that the facility's ethanol revenue would predominate over money generated from tipping fees and waste disposal services. Furthermore, Masada was under a legal obligation to provide NYSDEC with the best available information. Petitioner Cohen has presented no evidence to indicate that the revenue projections submitted by Masada were exaggerated or inaccurate.

With regard to the deference we owe the Administrator's focus on revenue projections, we first note that the CAA's implementing regulations refer to the *SIC Manual* explicitly in discussing the proper classification of pollutant-emitting facilities for purposes of the PSD program. The regulations define a "facility" as "all of the pollutant-emitting activities which belong to the same industrial grouping," and further provide that "[p]ollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same 'Major Group' (i.e., which have the same first two digit code) as described in the Standard Industrial Classification Manual, 1972, as amended by the 1977 Supplement." 40 C.F.R. § 52.21(b)(6). Petitioner Cohen suggests that this reference to the *SIC Manual* is merely "descriptive," but not determinative of the classification methodology that should be used to determine the applicable SIC code. In other words, petitioner Cohen would

have the Administrator use the number codes established by the *SIC Manual,* but ignore the instructions set forth therein for determining which code to used—instructions that state that projected revenue is the key determinant of a facility's primary activity, and thus its proper classification. Petitioner's argument distorts the plain significance of the regulation's reference to the *SIC Manual.* Indeed, there is no indication whatsoever in the regulation that only the codes found in the *SIC Manual,* but not the classification methodology, should be adopted. To the extent that there is any ambiguity in the CAA regulations as to this issue, we must defer to EPA's interpretation. *See Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (finding that an agency's interpretation of its own regulations to be "controlling unless plainly erroneous or inconsistent with the regulation.") (internal quotation omitted); *Christensen,* 529 U.S. at 588, 120 S.Ct. 1655 (explaining that *Auer* deference applies where the regulation is ambiguous); *see also Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 151, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (holding that courts should "presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers"). In any event, we find nothing irrational or arbitrary in EPA's use of the SIC Manual's classification methodology and its concomitant focus on revenue projections as the measure of the facility's primary activity. We therefore refuse to overturn the Administrator's determination on this ground.

### c. Departure from Past Practice

Petitioner Cohen argues that EPA has historically treated ethanol plants as chemical process plants, pointing out that the Administrator stated in her decision that "[t]here is little dispute that ethanol production falls within the category of a chemical process plant." EPA Order, 17–18. Petitioner Cohen suggests that the only difference between the Masada facility and other ethanol production facilities is the kind of "feedstock" it uses, *i.e.* trash rather than corn. Petitioner Cohen further contends that it was irrational for the Administrator to refuse to classify the facility as a chemical process plant simply because Masada adds a new process to ethanol production (materials recycling) that does not alter the facility's pollutant emitting characteristics.

Once again, petitioner Cohen fails to carry her burden of showing that the Administrator's decision was irrational or relied on improper factors. The fact that ethanol is produced by a facility does not necessarily mean that the facility is to be classified as a "chemical process plant." Where a facility that produces ethanol from municipal waste derives a clear majority of its revenue from the fees charged for waste disposal, and where the motivation for the construction of the facility was to deal with a municipal waste crisis, it is not "arbitrary and capricious" for the Administrator to conclude that the primary activity of the facility is not the production of ethanol, but waste processing. The Masada facility will undoubtedly serve the purpose of waste processing, even as it transforms that waste into ethanol. While petitioner Cohen is correct to point out that over seven million gallons of ethanol will be produced by the Masada facility each year, it must also be remembered that 230,000 tpy of solid waste and 49,000 tpy of sewage sludge will be disposed of in the process. This fact cannot be discounted in the manner proposed by petitioner Cohen.

### d. The Administrator's "Primary Activity" Determination Must Be Upheld

The wavering of EPA's position on the primary activity of the facility during the

course of NYSDEC's deliberations on Masada's permit application does, perhaps, suggest the closeness of the question. The most that can be said in favor of petitioner Cohen's position, however, is that the record before us indicates that the proper classification of the facility's primary activity is subject to reasonable disagreement. The complexity of transforming garbage into ethanol explains why most of the activities of the plant are dedicated towards ethanol production. But, as EPA contends, this does not mean, necessarily, that the plant is not engaged primarily in processing refuse that would otherwise end up in a landfill. If one focuses on the originating purpose of the facility, and how the facility will generate revenue (at least, according to the evidence presented to the Administrator), then it is clearly a "waste processing" facility that has the added benefit of producing ethanol. Given the closeness of the issue, there is no basis for concluding that the Administrator's choice between two plausible classifications was "arbitrary, capricious, [or] an abuse of discretion."

### 2. Allocation of the Gasifier Emissions

Although the Administrator concluded that the primary activity of the Masada facility was refuse processing, it nevertheless agreed with petitioner Cohen that "embedded" in the facility was a "chemical process plant" consisting of those processes and components necessary for the conversion of municipal waste into ethanol. The Administrator found, however, that this embedded source of pollution was not subject to PSD requirements because less than 100 tpy of sulfur dioxide would be produced by it. Key to this determination was the Administrator's exclusion of the gasifier's emissions from the total emissions of the embedded source. The Administrator justified this exclusion on the grounds that the gasifier will use lignin as a fuel to create steam, thereby obviating its landfill disposal.

Petitioner Cohen attacks this exclusion as an abuse of discretion, observing that the Administrator had previously concluded that most of the steam power from the gasifier will be used in ethanol production, and that the use of lignin as a fuel (as opposed to natural gas or other fuel sources) will make the ethanol production process more cost effective. Moreover, petitioner Cohen suggests that lignin cannot be considered a "waste product" but rather is a saleable fuel source, given its ability to power the gasifier. These factors, petitioner Cohen argues, clearly indicate that the gasifier and its use of lignin contribute to ethanol production and that its emissions should be allocated towards that chemical processing activity.

We cannot find that the Administrator's allocation of the gasifier's emissions was arbitrary or irrational. The use of lignin as a fuel has the effect of reducing a substantial amount of material drawn from the facility's waste intake. Moreover, if the gasifier did not burn the lignin, it would likely have to be disposed of as waste. The Spectra petition argued that "the principal purpose of the supposed gasifier is to eliminate the residue [lignin] from the Project's chemical processes to avoid the need for landfill disposal." The Spectra petition also stated that lignin "as a waste product, has no inherent value or use." To be sure, Masada had previously argued that lignin was *not* a waste product. Nevertheless, Petitioner Cohen cannot now argue that the Administrator abused its discretion in determining that *the Spectra petition* failed to demonstrate noncompliance with the CAA on the ground that lignin was mistakenly believed to be a waste product, when, in fact, the

**279**

Spectra petition argued just the opposite. Furthermore, the fact that the lignin produced by the hydrolysis step is combustible does not automatically render it a *marketable* fuel source, valuable in other applications. Indeed, petitioner Cohen has failed to point to any evidence in the record indicating that lignin produced at the Masada facility is a saleable commodity *for any purpose*, rather than merely a waste product whose sole value lies in the facility's ability to dispose of it in a way that also generates steam energy.

It is true that EPA took a different position on the allocation of gasifier emissions during the course of NYSDEC's deliberations. Once again, however, this change of view only indicates the closeness of the question presented, and the fact that both viewpoints are supported by evidence in the record; it does not suggest any irrationality in the Administrator's final decision. The gasifier lies at the intersection of the two main activities of the facility: waste disposal and ethanol production. Because the Administrator rationally concluded that the primary activity and purpose of the Masada facility is the disposal of waste, the gasifier, by burning and eliminating the waste-product lignin, can reasonably be said to contribute to this overall purpose. Although the energy created by this combustion powers the production of ethanol, the gasifier nevertheless supports the primary activity of the plant. Accordingly, we find no reversible error in the Administrator's decision concerning the allocation of the gasifier's emissions.

### 3. Failure to Consider Important Factors

Petitioner Cohen suggests that the Administrator failed to consider factors that were important to the proper classification of the facility, specifically, (a) the relative value added to the facility's production inputs by chemical processing and refuse processing activities; (b) the patents held by Masada describing the importance of lignin combustion to the economic viability of the facility; and (c) the possibility that the facility contains two separate pollution sources.

### a. Relative Value Added

Value added is an economic concept defined "as the increase in the value of goods and services brought about by whatever a business does to them between the time of purchase and the time of sale." *Trinova Corp. v. Michigan Dep't of Treasury*, 498 U.S. 358, 362, 111 S.Ct. 818, 112 L.Ed.2d 884 (1991) (internal quotation omitted). Petitioner Cohen faults the Administrator for not explicitly considering whether the chemical processing activities of the facility added greater value to the facility's inputs than its refuse processing activities. As indicated above, the *SIC Manual* suggests that the "primary activity" of a facility is to be determined by examining the facility's "principal product." The *SIC Manual* goes on to explain that the principal product may be identified by "its relative share of value added at the establishment." However, the *SIC Manual* also acknowledges that it is "rarely possible to obtain this measure for individual products or services." The *SIC Manual* thus recommends that, "when available," the use of revenue data may be used to determine the principal product of a facility. This "criterion," the *SIC Manual* explains, "may be expected to give approximately the same results in determining the primary activity of an establishment." Because the *SIC Manual* clearly indicates that revenue data may serve as an effective surrogate for "relative value added," we cannot conclude that the Administrator, in using such data, failed to consider proper factors in determining the principal product of the Masada facility.

### b. Consideration of Masada Patents

Petitioner Cohen further contends that the Administrator failed to consider information found in two patents that Masada referenced in its submission to EPA during the petitioning process. *See* Response of Pencor Masada Oxynol, LLC to Petitions to the Administrator, 10 n. 11 (Oct. 17, 2000) (citing U.S. Patent Nos. 5,407,817 and 5,517,703). Petitioner Cohen argues that these patents clearly disclose that Masada's ethanol production process could use other kinds of feedstock to produce ethanol, not only municipal solid waste and sewage sludge. Furthermore, petitioner Cohen contends that the patents also disclose that Masada considered lignin a valuable fuel source to power the production of ethanol, providing Masada with significant cost savings in the production process. Petitioner Cohen therefore suggests that the information provided in the patent is incompatible with the Administrator's determination that the use of lignin as a fuel for the gasifier constituted a waste elimination function.

We do not find any reversible error here. *First*, the ability of Masada's patented ethanol-producing process to use other types of feedstock is irrelevant to the question presented to the Administrator—to wit, whether the primary activity of the Masada facility *as designed for the Middletown site*, is waste processing or chemical processing. The plan that the Administrator reviewed is for the Masada facility to accept municipal waste and sewage sludge as inputs, not other kinds of materials. There is simply no suggestion in the record that the Masada facility will produce ethanol from other inputs. Indeed, as explained above, the *raison d'etre* of the Masada facility is to meet Middletown's waste disposal needs.

*Second*, with regard to the importance of lignin as an economical fuel source for the production of ethanol, this information was already before the Administrator, as indicated by the Administrator's acknowledgment that the gasifier "gasifies the lignin, combusts the gases, and recovers some of the energy produced, using it to provide steam back to the various waste and chemical processing operations." EPA Order, 17. Indeed, the Administrator explicitly concluded that "[e]ven if energy is recovered from gasification/combustion [of lignin] as a side benefit and used for ethanol production, and even if the presence of a waste stream and integrated disposal process makes ethanol production economical at this site, this does not change the determination that the primary activity is refuse processing." EPA Order, 19. Thus, the information found in the Masada patents merely stands as cumulative evidence supporting factual claims already considered, and accepted as true for purposes of argument, by the Administrator in her final decision. In sum, there is no indication that the Administrator "failed to consider [this] important aspect of the problem," as petitioner Cohen contends. *Muszynski*, 268 F.3d at 97 (internal quotation omitted).

### c. Possibility of Two Sources at the Facility

Finally, petitioner Cohen contends that the Administrator failed to consider the possibility that the facility contained two separate sources of air pollution. Petitioner Cohen takes issue with the Administrator's determination that "there is no dispute in this case that the various interrelated activities at the Masada facility constitute a single source for PSD purposes." EPA Order, 15 n. 9. Petitioner Cohen fails to acknowledge, however, that the likely reason that the Administrator found "no dispute" over this issue is that the Spectra petition explicitly rejected the possibility of two source classifications:

"the Project must be identified with SIC Code 2869 for an industrial chemical processing facility *and not* with SIC Code 4953 for a refuse system." Spectra petition, at 22 (emphasis added). As the Administrator explained, "[t]he boundaries of the major source have never been at issue...." EPA Order, 19. Moreover, the Administrator necessarily considered the possibility that two sources existed at the facility in rejecting the applicability of "support facility" analysis. The Administrator explained:

> Questions of "support facilities" often arise in making major source determinations under the PSD program when questions arise as to whether facilities are part of the same industrial grouping. Where a facility conveys, stores, or otherwise assists in the production of the principal product *at another source,* it may, under some circumstances, be deemed a support facility and treated as part of the same source as the facility it supports. This policy is used, for example, in determining whether two adjacent facilities should be treated as one source for PSD applicability purposes. However, the support facility test is not relevant to the Masada facility *because there is no question that the chemical processing activities and the waste reduction activities at [the] Masada facility are a single source.*

*Id.* (emphasis added). As indicated by this passage, the Administrator rejected the support facility analysis on the ground that there was "no question" that the facility's chemical processing and refuse processing activities constituted one source of air pollution. In concluding that the chemical processing activities were an *embedded* source of pollution, rather than a *separate* source from the refuse processing activities, the Administrator further indicated that these chemical processing activities were part of the same industrial grouping.

*See* EPA Order, 16 (explaining that, for facilities subject to the 250 tpy threshold, the PSD applicability test requires "an evaluation of the facility to determine if there is a *portion of the plant* (which EPA calls an 'embedded' or 'nested' facility or source) which could be classified in one of the categories with a 100 tpy major source cutoff" (emphasis added)). Finally, as discussed above, the waste processing and ethanol production components of the facility are intertwined—indeed, so much so, that the record supports two plausible views as to where the dividing line between the two functions should be drawn. We therefore find no merit to petitioner Cohen's suggestion that the Administrator overlooked the possibility of classifying the Masada facility as if it contained two separate sources of air pollution.

### III. CONCLUSION

We have considered all of petitioner Cohen's remaining arguments and find them to be without merit. The petition for review is therefore denied.