07-1737-ag(L), 07-2011-ag(Con), 07-5141-ag(Con)
Green Island Power Authority v. Federal Energy Regulatory Commission

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————

August Term, 2008

(Argued: December 19, 2008                    Decided: August 10, 2009)

Docket Nos. 07-1737-ag(L), 07-2011-ag(Con), 07-5141-ag(Con)

————————

GREEN ISLAND POWER AUTHORITY,
ADIRONDACK HYDRO DEVELOPMENT CORPORATION,

*Petitioners*,

—v.—

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*,

ERIE BOULEVARD HYDROPOWER, L.P.,

*Intervenor*.

————————

B e f o r e:

SACK and KATZMANN, *Circuit Judges*.[*]

————————

[*] The Honorable Sonia Sotomayor, originally a member of the panel, was elevated to the Supreme Court on August 8, 2009. The two remaining members of the panel, who are in agreement, have determined the matter. *See* 28 U.S.C. § 46(b); Local Rule 0.14(2); *United States v. Desimone*, 140 F.3d 457 (2d Cir. 1998).

Petition for review of several orders and notices issued by the Federal Energy Regulatory Commission during the proceedings to relicense the School Street Hydroelectric Project. Adirondack Hydro Development Corporation's petitions are denied on the ground that it lacks standing to challenge any of the orders or notices issued in the administrative proceedings. We grant Green Island Power Authority's petition for review of the order denying its motion to intervene, vacate the license order, and remand the case for further proceedings consistent with this opinion.

————————

FRANCES E. FRANCIS (William S. Huang and Rebecca J. Baldwin, *on the brief*), Spiegel & McDiarmid, LLP, Washington, D.C., *for Petitioners*.

HOLLY E. CAFER (Cynthia A. Marlette, General Counsel, and Robert H. Solomon, Solicitor, *on the brief*), Federal Energy Regulatory Commission, Washington, D.C., *for Respondent*.

JOHN A. WHITTAKER, Winston & Strawn, LLP, Washington, D.C. (Mel R. Jiganti, U.S. Legal Director, Brookfield Power, Marlborough, MA, *on the brief*), *for Intervenor*.

Marc S. Gerstman (Jennifer M. Wilson and Jessica Backer Brand, *on the brief*), Law Offices of Marc S. Gerstman, Albany, N.Y., *for Amici Curiae* Scenic Hudson, Inc., Capital District Regional Planning Commission, Village of Green Island, Town of Green Island, City of Watervliet, Town of Waterford, New York Bicycling Coalition, Inc., New York Association of Public Power, Public Utility Law Project of New York, Inc., and Friends of the Falls, in support of *Petitioners*.

————————

KATZMANN, *Circuit Judge*:

This case arises out of proceedings before the Federal Energy Regulatory Commission ("FERC") to relicense the School Street Hydroelectric Project. It calls upon us principally to consider the validity of the order denying Green Island Power Authority's ("Green Island")

2

motion to intervene, and the order granting a new license to Erie Boulevard Hydropower, L.P. ("Erie") to operate the School Street Hydroelectric Project for a term of forty years. For the reasons stated below, we find that Adirondack Hydro Development Corporation ("Adirondack") lacks standing to challenge any of the orders issued during the administrative proceedings. We further find that FERC acted arbitrarily and capriciously when it denied Green Island's motion to intervene in the relicensing proceedings. Because we cannot conclude that this error was not prejudicial, we vacate the license order and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

The School Street Hydroelectric Project ("School Street Project" or "School Street") is located on the Mohawk River in Albany and Saratoga Counties in New York State. It diverts water from the river at a dam located nearly 4000 feet upstream from Cohoes Falls, New York's second largest waterfall. The water runs through a power canal that is 4400 feet long and 150 feet wide and ultimately flows into a powerhouse containing five generating units with a total installed electrical capacity of 38.8 megawatts ("MW"). The water flows through the powerhouse and is returned to the Mohawk River downstream from Cohoes Falls. In total, water diverted from the river by the School Street Project bypasses approximately 4500 feet of the riverbed, including the waterfall.

The School Street Project dam was constructed in 1831, and the facility began to be utilized to generate electrical power in 1916. Niagara Mohawk Power Corporation ("Niagara Mohawk") filed an application for an original license to operate the School Street Project on

3

August 20, 1965.[1] The Federal Power Commission[2] issued such a license to Niagara Mohawk on June 11, 1969, for a term to run from April 1, 1962 to December 31, 1993. *See Niagara Mohawk Power Corp.*, 41 F.P.C. 772, 773 (1969).

Niagara Mohawk held the license and operated the School Street Project for that entire term. Two years prior to the end of the term, on December 23, 1991, Niagara Mohawk filed an application for a new license for the School Street Project, pursuant to § 15(c)(1) of the Federal Power Act ("FPA"). *See* 16 U.S.C. § 808(c)(1) ("Each application for a new license pursuant to this section shall be filed with the Commission at least 24 months before the expiration of the term of the existing license."). That application proposed to add a 21-MW capacity generator to the School Street Project, which would have increased its total electrical generating capacity to approximately sixty megawatts. In addition, the application proposed recreational, fisheries, historic preservation, and water quality enhancements.

Niagara Mohawk was the only entity to submit an application for the School Street Project by the statutory deadline of December 31, 1991. In response, FERC issued public notice

---

[1] An "original license" is the type of license that FERC issues "for an unlicensed project, whether constructed or unconstructed." *Consol. Hydro Me., Inc.*, 81 F.E.R.C. ¶ 62,172, 64,372 n.17 (1997). An original license is different from a "new license," which is "any license, except an annual license issued under section 15 of the Federal Power Act, for a water power project that is issued under the Federal Power Act after the initial license for that project." 18 C.F.R. § 4.30(b)(19); *see also S. Cal. Edison Co. v. FERC*, 116 F.3d 507, 509 (D.C. Cir. 1997) ("The Federal Power Act authorizes the Federal Energy Regulatory Commission to issue two sorts of licenses for hydropower projects: 'original licenses,' for projects that have yet to be built, and 'new licenses,' for existing projects whose original licenses have expired."). A new license is issued at the conclusion of a "relicensing proceeding."

[2] The Federal Power Act, 16 U.S.C. §§ 791a–828c, created the Federal Power Commission. FERC succeeded the Federal Power Commission in 1977. *See DiLaura v. Power Auth.*, 982 F.2d 73, 75 n.1 (2d Cir. 1992).

describing in broad terms the proposal contained within that application and setting a deadline of April 12, 1993, for the filing of comments, protests, and motions to intervene. Timely motions to intervene were filed by American Whitewater Affiliation, American Rivers, Inc., New York Rivers United, the Natural Heritage Institute, the National Audubon Society, R. Pisani and W. Corrigan, the United States Department of the Interior, and Adirondack Mountain Club.

As part of the relicensing process, Niagara Mohawk was required to request a certification from the New York State Department of Environmental Conservation ("NYS DEC") that the discharge from the School Street Project into the Mohawk River would comply with applicable provisions of the Clean Water Act. *See* 33 U.S.C. § 1341(a)(1). Indeed, FERC was prohibited from granting a license until this certification had been provided, unless NYS DEC waived the requirement, which it could do by failing or refusing to act on Niagara Mohawk's certification request within "a reasonable period of time (which shall not exceed one year) after receipt of such request." *Id.* Niagara Mohawk requested this certification for the School Street Project, which NYS DEC denied in November 1992 without prejudice to renewal. Niagara Mohawk appealed that decision, and it and NYS DEC entered into settlement negotiations regarding the certification and licensing of School Street and nine other hydroelectric projects operated by Niagara Mohawk. Those negotiations continued into 2005; during that time period, FERC issued annual licenses, pursuant to 16 U.S.C. § 808(a)(1), that allowed Niagara Mohawk to continue to operate the School Street Project. *See Table of Notices of Authorization for Continued Project Operations*, 66 F.E.R.C. ¶ 61,145, 61,279 (1994).

While the negotiations between Niagara Mohawk and NYS DEC were on-going, FERC continued to analyze the School Street license application. In November 1995, FERC issued

public notice that the School Street Project was ready for an environmental analysis. It stated that Niagara Mohawk intended to add an additional generator to increase School Street's installed capacity to approximately sixty megawatts, which would require an expansion of the existing powerhouse and excavation of the power canal. The notice solicited comments, reply comments, recommendations, terms and conditions, and prescriptions. *See Notice of Application Ready for Environmental Analysis* (Nov. 16, 1995).

Niagara Mohawk responded to this notice by informing FERC that it no longer viewed the installation of the proposed 21-MW generator as economically feasible, and it advised FERC that its environmental analysis should consider, as an alternative, relicensing School Street without that additional generating capacity. *See* Letter from Jerry L. Sabattis, Niagara Mohawk Hydro Licensing Coordinator, to John H. Clements, Director, FERC Office of Hydropower Licensing (Dec. 13, 1995), at 2 (stating that Niagara Mohawk "no longer intend[ed] to install" the generator). Notwithstanding Niagara Mohawk's view that the removal of the proposed generator would "materially affect[] Niagara Mohawk's fish protection/enhancement plan proposal," *id.*, FERC did not issue any public notice of this change. Instead, it issued a draft environmental assessment of the School Street Project in November 1996 that analyzed the license application both with and without the 21-MW generator, concluding that it "d[id] not recommend [Niagara Mohawk's] proposed new [generator] and related improvements to the power canal." *See Draft Environmental Assessment for Hydropower License* (Nov. 1996), at 53. FERC issued public notice announcing the availability of the draft environmental assessment and seeking comments on it. *See Notice of Availability of Draft Environmental Assessment*, 61 Fed. Reg. 60,277 (Nov. 20, 1996).

One of the parties that filed comments was the NYSD Limited Partnership, the owner of the New York State Dam Hydroelectric Project, which was located on the Mohawk River approximately one mile downstream from the School Street Project. In addition, Adirondack, the managing general partner of the NYSD Limited Partnership, filed a motion to intervene out-of-time in the School Street relicensing proceedings on March 26, 1997; it asserted that its interest in the proceedings derived from its ownership interest in the New York State Dam, which could be adversely impacted by FERC's licensing order given (1) its location relative to School Street and (2) the fact that the School Street Project impacted downstream flows on the Mohawk River. FERC granted Adirondack's motion to intervene on August 19, 1997.

Following Adirondack's intervention, time passed without much action in the relicensing proceedings. In February 1999, Niagara Mohawk and Erie submitted a joint application seeking approval of, *inter alia*, (1) the transfer of School Street's license from Niagara Mohawk to Erie, and (2) substitution of Erie in place of Niagara Mohawk as the applicant on the pending School Street license application. FERC issued public notice of this application and set a deadline of June 9, 1999, for filing comments and motions to intervene. *See Notice of Transfer of Licenses and Soliciting Comments, Motions to Intervene, and Protests* (May 5, 1999). FERC subsequently granted the application, the School Street license was transferred to Erie, and Erie was substituted on the pending license application. *See Order Approving Transfers of Licenses, Partial Transfer of License, and Substitution of Applicants*, 88 F.E.R.C. ¶ 62,082, 64,159 (1999).

The proceedings then sat idle again for almost two years until May 2001, at which time Erie sent a letter notifying FERC that Erie had reviewed the pending license application in light of the then-current market conditions and concluded that "the addition of a new [generator]

7

would now appear to be economically feasible." Letter from William J. Madden, Jr., Attorney for Erie Boulevard Hydropower, L.P., to David P. Boergers, Secretary, Fed. Energy Regulatory Comm'n (May 30, 2001), at 1. Erie therefore requested that FERC "evaluate the merits of the new license proposal as originally filed." *Id.* FERC did not issue public notice of Erie's change in position, nor did it seek motions to intervene.

Instead, FERC completed its final environmental assessment ("FEA") of the School Street license application and issued public notice of its availability on September 28, 2001, setting a comment deadline for forty-five days later. *See Notice of Availability of Final Environmental Assessment* (Sept. 28, 2001). In the FEA, FERC compared the School Street Project as proposed in the original license application (with the 21-MW generator) with possible alternatives, including (1) a proposal containing changes recommended by FERC's staff and (2) relicensing the School Street Project without any changes. Moreover, FERC considered, but dismissed, the options of granting a "nonpower license"[3] or retiring School Street altogether, because those options were "not reasonable in the circumstances of this case." *Final Environmental Assessment* (Sept. 2001), at 12-13.

With respect to the proposed addition of the 21-MW generator, FERC concluded that "[w]hile [Erie's] motivation for the proposal to construct the new unit which would produce incremental power at cost more than one-hundred-fifty percent more than its current value in the market is unclear, it should be given the opportunity to pursue the project expansion, since the

---

[3] A "nonpower license" is a temporary license that can be issued by FERC whenever, in its judgment, a licensed project "should no longer be used or adapted for use for power purposes" and where "a State, municipality, interstate agency, or another Federal agency is authorized and willing to assume regulatory supervision of the lands and facilities included under the nonpower license and does so." 16 U.S.C. § 808(f).

additional unit would have no significant detrimental environmental impacts and would produce more power from a renewable resource." *Id.* at 72.

In July 2004, Green Island filed an application (along with supporting comments) for a preliminary permit to study the potential development of the Cohoes Falls Project, a proposed 100-MW capacity hydroelectric project to be located on the Mohawk River just downstream from the School Street Project. *See Green Island Power Auth.*, 110 F.E.R.C. ¶ 61,034, 61,108–09 (2005). It followed this up on September 7, 2004, with a motion to intervene in the School Street relicensing proceedings, stating that it first developed an interest in the proceedings in 2001 when it assisted the City of Cohoes in an effort to secure the School Street site from Erie. It did not seek to intervene until 2004, however, because it was not until that time that Green Island had developed what it considered to be a better proposal for this stretch of the Mohawk River. Green Island moved to intervene because it recognized that the Cohoes Falls Project could be developed only if the School Street Project dam were removed and the powerhouse decommissioned.

FERC denied Green Island's application for a preliminary permit, finding that because the School Street and Cohoes Falls Projects could not co-exist, "any development application for the Cohoes Falls Project would be a relicense application filed in competition with the School Street application." *Green Island Power Auth.*, 110 F.E.R.C. ¶ 61,034, at 61,110. FERC considered such an application barred by § 15(c)(1) of the FPA, because the "deadline for filing relicense applications for the Cohoes Falls project fell in 1991, two years before the School Street license expired. Thus, any development application [Green Island] might file would be more than 13 years late." *Id.* FERC found also that its own regulations barred acceptance of the

9

preliminary permit application. *Id.* at 61,111. It did not act on Green Island's motion to intervene at this time.[4]

In March 2005, Erie filed an offer of settlement (the "Offer of Settlement") with FERC pursuant to Rule 602 of FERC's regulations. *See* 18 C.F.R. § 385.602. The Offer of Settlement, which was signed by Erie, the United States Fish and Wildlife Service, the National Park Service, NYS DEC, New York Power Authority, New York Rivers, New York State Conservation Council, and Rensselaer County Conservation Alliance, proposed, *inter alia*, that Erie would: (1) operate the School Street Project in run-of-river mode; (2) ensure certain minimum flows of water to the bypassed stretch of the Mohawk River, including a 500 cubic feet per second aesthetic flow over Cohoes Falls during daylight hours on weekends and federal holidays from May 15 to October 31; (3) install certain fish protection mechanisms; and (4) consider installing a new turbine-generator unit and powerhouse addition that would increase the electrical generating capacity of School Street by approximately eleven megawatts. With respect to the proposed 11-MW generator, which would replace the proposed 21-MW generator in the license application, the Offer of Settlement provided that "within five years of license issuance, Erie Boulevard could install and operate a new 'fish-friendly' turbine generator unit in a new powerhouse or powerhouse addition . . . ." *Order on Offer of Settlement and Issuing New License*, 118 F.E.R.C. ¶ 61,101, 61,514 (2007). As part of the Offer of Settlement, NYS DEC issued a draft water quality certificate in accordance with § 401 of the Clean Water Act.

---

[4] Green Island sought rehearing of FERC's decision, which FERC denied. *See Green Island Power Auth.*, 110 F.E.R.C. ¶ 61,331 (2005). Green Island filed a petition for review of that decision with the D.C. Circuit, but it later filed a voluntary motion to dismiss the petition, which was granted. *See Green Island Power Auth. v. FERC*, No. 05-1170, 2005 WL 3803356, 2005 U.S. App. LEXIS 27787 (D.C. Cir. Dec. 14, 2005).

FERC issued public notice of the Offer of Settlement on March 24, 2005, and, pursuant to 18 C.F.R. § 385.602(f)(2), noted that the deadline for filing comments was twenty days from that date. *See Notice of Settlement Agreement Accepted for Filing and Soliciting Comments* (Mar. 24, 2005). Green Island filed extensive comments in opposition. It also renewed its motion to intervene, which had been pending since the middle of 2004, asserting that FERC should have solicited interventions because the Offer of Settlement constituted a material amendment to the School Street license application.

Furthermore, on May 15, 2006, Green Island, Adirondack, and *amici curiae* Capital District Regional Planning Commission, New York Association of Public Power, and Friends of the Falls submitted what they labeled an "Alternative Offer of Settlement" for FERC's consideration. The Alternative Offer of Settlement proposed to resolve the School Street relicensing proceedings by permitting Erie to choose between two options: (1) the immediate termination of Erie's license; or (2) the issuance of a conditional license to Erie. Once Erie had selected one of the proposed options, Green Island planned to submit an application to license the Cohoes Falls Project; that application was attached to the Alternative Offer of Settlement. Green Island, however, recognized that FERC was statutorily barred from considering the application as a competing license application for the School Street site. Consequently, it included the application with the Alternative Offer of Settlement "for informational purposes only," arguing that FERC could consider the information contained in the application when deciding whether to grant a license to the School Street Project.

On that same day, the New York Association of Public Power, the Friends of the Falls, and the Capital District Regional Planning Commission all filed (1) motions to intervene out-of-

11

time in the School Street relicensing proceedings and (2) comments in support of the Alternative Offer of Settlement. The New York Bicycling Coalition, the City of Watervliet, the Town of Green Island, the Village of Green Island, the Preservation League of New York State, and the Public Utility Law Project of New York, Inc. all filed similar motions and comments on June 2. Additionally, the Town and Village of Green Island, the New York Bicycling Coalition, the Preservation League of New York State, the City of Watervliet, and the Alliance for Economic Renewal[5] signed on to the Alternative Offer of Settlement.

FERC rejected the Alternative Offer of Settlement and the attached proposed license application as simply "another attempt to place Green Island's untimely competitive proposal before the Commission." *Notice Rejecting Pleading* (May 24, 2006). In response, Green Island and Adirondack filed a "Joint Motion to Present Evidence or, in the Alternative, Offer of Proof" (the "Joint Motion to Present Evidence") on June 5, 2006, in which they explained that the Alternative Offer of Settlement was not a competing license application but rather was submitted to provide helpful evidence to demonstrate that Erie's license application and Offer of Settlement were not best adapted to a comprehensive plan for the Mohawk River.

FERC rejected this motion as well, again on the ground that the filing was an "attempt to place Green Island's untimely competitive proposal before the Commission." *Notice Rejecting Motion* (June 28, 2006). On that same day, FERC also denied Green Island's motion to intervene out-of-time. *See Notice Denying Late Intervention* (June 28, 2006). In doing so, FERC noted that Green Island had developed an interest in the proceedings in 2001 but had impermissibly

_____

[5] The Alliance for Economic Renewal apparently filed a motion to intervene out-of-time on April 13, 2005.

"[sat] on its rights" for three years before filing its motion to intervene in 2004. *Id.* at 1. Further, FERC concluded that Green Island's "primary interest" in the proceedings, i.e., "having its proposed Cohoes Falls Project considered as an alternative to the School Street Project," was not a sufficient reason for FERC to grant intervenor status, because FERC was statutorily barred from considering untimely license applications. *Id.* at 2.

In addition, FERC denied the motions to intervene filed by all of the other parties that had expressed support for the Cohoes Falls Project proposal, because (1) no party had shown good cause as to why it had waited so long to seek leave to intervene, and (2) each party's primary interest – supporting the Cohoes Falls Project as an alternative to the School Street Project – was insufficient to warrant intervenor status at that stage of the proceedings.[6]

Green Island and Adirondack requested rehearing of FERC's orders denying the Alternative Offer of Settlement and the Joint Motion to Present Evidence, and Green Island and all of the other parties that had sought to intervene out-of-time requested rehearing of FERC's denial of those motions. FERC denied all of these requests. *See Order Denying Rehearing*, 117 F.E.R.C. ¶ 61,189 (2006) (the "*November 16 Order Denying Rehearing*"). At the outset of this order, FERC reiterated its view that Green Island could not file an application for the Cohoes Falls Project proposal "because that project would compete with School Street and a license application for Cohoes Falls was not filed within the statutory window for competition in the School Street proceeding." *Id.* at 61,931. Furthermore, FERC stated that it "look[ed] with

---

[6] FERC later granted two motions to intervene out-of-time, one each filed by NYS DEC and the National Marine Fisheries Service on May 3, 1995, and January 16, 1996, respectively. In granting those motions, FERC noted that (1) it inadvertently had failed to grant them at the time they were filed, and (2) granting the motions at that point would not unduly delay or disrupt the proceedings. *See Notice Granting Late Interventions* (Aug. 8, 2006).

13

extreme disfavor on [Green Island's] repeated efforts to obtain approval of that which is barred by law, and consider[ed] its efforts to cloak its proposal in various different guises as an abuse of process." *Id.*

Turning to the specific orders for which rehearing was sought, FERC first addressed its denial of the various motions to intervene, treating each as untimely and thus evaluating them pursuant to the factors delineated in Rule 214(d) of its regulations, 18 C.F.R. § 385.214(d). It denied rehearing of Green Island's motion to intervene because Green Island "ha[d] failed to demonstrate either a cognizable interest in the proceeding or any justification for the lateness of its attempted intervention." *November 16 Order Denying Rehearing*, 117 F.E.R.C. ¶ 61,189, at 61,932. FERC similarly denied rehearing of the other motions to intervene, concluding that all of those parties simply intended to express support for the Cohoes Falls Project. *Id.* at 61,933 ("[T]hose entities are engaged in a campaign to convince the Commission to consider the merits of the Cohoes Falls Project, notwithstanding our final orders clearly holding that to do so would be contrary to the dictates of the FPA and of our regulations."). FERC did note, however, that the interests of Green Island and these other entities could be represented by Adirondack. *Id.*

FERC denied rehearing of the Joint Motion to Present Evidence as well, again stating that although it would consider comments filed in the proceedings, there was no reason for it to "accept what purports to be a complete application for a proposal that is statutorily barred, no matter in what guise it is presented." *Id.* at 61,936. Furthermore, FERC rejected Green Island and Adirondack's contention that it was required to compare the School Street Project with the "largely hypothetical Cohoes Falls Project, which is barred by the statute," reasoning that

> [t]o conclude that an entity can ignore the statutory and regulatory parameters that

14

govern hydropower licensing proceedings by making a completely new proposal at the eleventh hour, and that the parties must then respond to it, and the Commission must conduct an extensive new analysis, including a complete environmental and engineering review, would be exceedingly unfair, and would mean that anyone could delay the completion of a licensing proceeding simply by postulating a supposed alternative at any time. This would make a mockery of the regulatory process and we will not countenance such a notion.

*Id.* at 61,936–37. And finally, FERC denied rehearing of its decision rejecting the Alternative Offer of Settlement, stating that (1) it was "unilateral and . . . a settlement offer in name only," and (2) although FERC was required to consider alternatives to the School Street Project, "[d]isguising a late-filed competitive proposal as an environmental alternative d[id] not create an obligation that the Commission examine it, or empower the Commission to do that which the FPA forbids."[7] *Id.* at 61,937–38.

While FERC was considering these various motions for rehearing, the NYS DEC finally issued a water quality certification for the School Street Project. Consequently, on February 15, 2007, FERC approved the Offer of Settlement and issued a forty-year license for the School Street Project. *See Order on Offer of Settlement and Issuing New License*, 118 F.E.R.C. ¶ 61,101 (2007). Green Island and Adirondack requested rehearing of the license order, arguing, *inter alia*, that FERC had violated its regulations, which required it to solicit motions to intervene anytime a license applicant materially amended its application for a new license. *See* 18 C.F.R. § 16.9(b)(3), (d)(1) (requiring "notice of the application and of the dates for comment, intervention, and protests" if an application for a new license is materially amended by the applicant). The petitioners identified three points in time when they believed that the School

---

[7] Green Island and Adirondack requested rehearing of the order denying rehearing, which was denied. *See Order Rejecting Request for Rehearing, Motion for Clarification, and Request for Reconsideration*, 118 F.E.R.C. ¶ 61,196 (2007).

15

Street license application had been materially amended without a corresponding opportunity to intervene: (1) in 1995, when Niagara Mohawk notified FERC that it intended not to install the 21-MW generator; (2) in 2001, when Erie notified FERC that it planned to install the 21-MW generator; and (3) in 2005, when Erie submitted the Offer of Settlement indicating that it was not going to install that generator, but rather that it might install an 11-MW generator instead.

FERC rejected Green Island's request for rehearing of the license order on the ground that only a "party" to the relicensing proceedings – a status Green Island had not attained – could make such a request. *See Notice Rejecting Rehearing Request*, 119 F.E.R.C. ¶ 61,038 (2007). It denied Adirondack's request for rehearing on the grounds that (1) Adirondack failed to demonstrate how it had been aggrieved by the licensing order, and (2) Adirondack's arguments on rehearing lacked merit. *See Order Denying Rehearing*, 120 F.E.R.C. ¶ 61,267, 62,183 (2007) ("*September 21 Order Denying Rehearing*"). In relevant part, FERC disagreed that any of the changes to the license application warranted the solicitation of motions to intervene. Specifically, it stated that Niagara Mohawk did not amend its license application in 1995 because "it took no steps to alter the original application. By not requiring that a formal amendment application be filed, the Commission preserved the possibility of licensing the additional capacity if economic conditions improved." *Id.* at 62,184. FERC concluded, however, that even had Niagara Mohawk amended the application in 1995, the amendment would not have been material because "omitting the additional generating unit would not significantly affect the project's flow regime."[8] *Id.*; *see* 18 C.F.R. § 4.35(f)(1)(i). FERC offered similar reasoning with respect to

---

[8] By contrast, FERC indicated that if Niagara Mohawk "had wanted to increase the number of proposed generating units at the site, it could not have done so without filing an amended application to reflect the increased capacity." *Id.*

16

Erie's 2001 request to reinstate the 21-MW generator. *See September 21 Order Denying Rehearing*, 120 F.E.R.C. ¶ 61,267, at 62,185.

FERC provided a different reason for why the March 2005 Offer of Settlement did not require the solicitation of motions to intervene. Adirondack had argued that by filing the Offer of Settlement, Erie had withdrawn the 1991 license application and replaced it with a different application. FERC rejected that argument, instead characterizing the role of a settlement agreement as "supplement[ing] rather than supersed[ing] the license application." *Id.* Further, FERC asserted that the Offer of Settlement did not significantly affect any interests in a manner not contemplated by the initial license application. *Id.* at 62,186. And finally, FERC explained that the Offer of Settlement had been reached after consultation with resource agencies and contained changes responsive to requests from those agencies. *Id.* at 62,185. In FERC's view, its regulations exempted such changes from the intervention requirement, even if they materially amended the license application. *Id.* at 62,185–86 & n.26 (citing 18 C.F.R. § 4.35(e)(4)). Consequently, FERC concluded that it did not have to solicit motions to intervene in response to the filing of the Offer of Settlement.

Green Island and Adirondack filed petitions for review of the following FERC orders and notices: (1) the March 15, 2007 Order Rejecting Request for Rehearing, Motion for Clarification, and Request for Reconsideration, 118 F.E.R.C. ¶ 61,196; (2) the November 16, 2006 Order Denying Rehearing, 117 F.E.R.C. ¶ 61,189; (3) the June 28, 2006 Notice Rejecting Motion; (4) the June 28, 2006 Notice Denying Late Intervention; (5) the May 24, 2006 Notice Rejecting Pleading; (6) the February 15, 2007 Order on Offer of Settlement and Issuing New License, 118 F.E.R.C. ¶ 61,101; (7) the April 12, 2007 Notice Rejecting Rehearing Request, 119 F.E.R.C.

17

¶ 61,038; and (8) the September 21, 2007 Order Denying Rehearing, 120 F.E.R.C. ¶ 61,267. We have consolidated all of these petitions into this appeal.

## DISCUSSION

This Court's review of the instant petitions is governed by the judicial review provision of the FPA, which provides that FERC's findings of fact, "if supported by substantial evidence, shall be conclusive." *See* 16 U.S.C. § 825*l*(b). Section 825*l*(b), however, does not set forth a separate standard of review for FERC's actions. We therefore must evaluate FERC's orders under the standard established by the Administrative Procedure Act. *See LaFleur v. Whitman*, 300 F.3d 256, 267 (2d Cir. 2002) (citing 5 U.S.C. § 706). Those orders must be upheld if they are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In evaluating whether an agency decision is arbitrary or capricious, we "'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). "We may set aside an agency determination as arbitrary and capricious if we conclude that the agency 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *LaFleur*, 300 F.3d at 267 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

18

Under § 825*l*(b), only a "party" that has been "aggrieved" by a FERC order may file a petition for review of that order. 16 U.S.C. § 825*l*(b); *see Scenic Hudson Pres. Conference v. FPC*, 354 F.2d 608, 617 (2d Cir. 1965) ("*Scenic Hudson*"). FERC has the authority to control who may become a "party" to proceedings before it. *See* 16 U.S.C. § 825g(a) ("In any proceeding before it, the Commission, in accordance with such rules and regulations as it may prescribe, may admit as a party any interested State, State commission, municipality, or any representative of interested consumers or security holders, or any competitor of a party to such proceeding, or any other person whose participation in the proceeding may be in the public interest."); *Scenic Hudson*, 354 F.2d at 617 (recognizing that the ability to petition for review is predicated on party status, and that FERC has the authority "to limit those eligible to intervene or to seek review" by denying party status). A party is "aggrieved" if it can establish that it has both constitutional and prudential standing to challenge FERC's orders. *See City of Orrville v. FERC*, 147 F.3d 979, 985 (D.C. Cir. 1998); *Scenic Hudson*, 354 F.2d at 615-16. Consequently, we must determine as a threshold matter whether either Adirondack or Green Island was a party to the proceedings below and, if so, whether either has standing to challenge the resulting orders.

## A. Party Status of the Petitioners

Adirondack became a party to the relicensing proceedings when FERC granted its motion to intervene in 1997 and thus satisfies this element of § 825*l*(b). *See November 16 Order Denying Rehearing*, 117 F.E.R.C. ¶ 61,189, at 61,935 n.42.

It is undisputed that Green Island never was permitted to intervene in the proceedings below. Consequently, Green Island was not a party to the relicensing proceedings and therefore lacks the statutory authority to petition for review of orders resulting directly from those

19

proceedings. *See Scenic Hudson*, 354 F.2d at 617. Green Island, however, was a party to the

order denying its motion to intervene out-of-time and the order denying rehearing of that order, a

point conceded by FERC. It therefore satisfies the first element of § 825*l*(b) with respect to those

two orders. *See N. Colo. Water Conservancy Dist. v. FERC*, 730 F.2d 1509, 1515 (D.C. Cir.

1984) ("It would be grossly unfair to deny judicial review to a petitioner objecting to an agency's

refusal to grant party status on the basis that the petitioner lacks party status. Such a petitioner

must obviously be considered a party for the limited purpose of reviewing the agency's basis for

denying party status."); *see also City of Orrville*, 147 F.3d at 989–90 n.12; *Covelo Indian Cmty.

v. FERC*, 895 F.2d 581, 585–86 (9th Cir. 1990).

**B.      Standing of the Petitioners**

As discussed above, the requirement that a party be "aggrieved" by a FERC order is

coextensive with the requirement that it be able to establish both constitutional and prudential

standing to challenge that order.

"Three elements comprise the 'irreducible constitutional minimum of standing.'"

*LaFleur*, 300 F.3d at 269 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To

satisfy Article III's standing requirements, a party must demonstrate that "'(1) it has suffered an

"injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural

or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and

(3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision.'" *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) (quoting

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

The "injury in fact" requirement has been characterized as "an invasion of a legally protected

interest." *Lujan*, 504 U.S. at 560. The party seeking judicial review "bear[s] the burden of alleging facts that demonstrate [its] standing." *LaFleur*, 300 F.3d at 268.

Prudential standing is not a constitutional consideration but rather "embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Prudential standing considerations include, *inter alia*, "'the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *Devlin v. Scardelletti*, 536 U.S. 1, 7 (2002) (quoting *Allen*, 468 U.S. at 751).

1.    Adirondack

FERC contends that the only interest Adirondack has ever identified to justify its presence as a party in the relicensing proceedings – its interest in the New York State Dam Hydroelectric Project resulting from its position as the managing partner of that project – is insufficient to serve as the current basis for an injury-in-fact given that Adirondack no longer is involved with that project. It therefore argues that Adirondack lacks standing to challenge any of FERC's orders. Adirondack concedes that it no longer owns or operates any hydroelectric projects on the Mohawk River, but it contends that it can establish an injury-in-fact resulting from FERC's orders in three ways.

First, Adirondack points to the fact that various parties moved to intervene out-of-time in the relicensing proceedings. Those parties had a broad range of interests, including environmental, cultural, aesthetic, public health, historic preservation, and restoration interests. FERC denied those motions, in part, on the ground that Adirondack, which was already a party to

the proceedings, "appear[ed] aligned" with the potential intervenors and thus could represent their interests. *See November 16 Order Denying Rehearing*, 117 F.E.R.C. ¶ 61,189, at 61,933. Adirondack contends that this constituted a concession by FERC that Adirondack *shared* those interests and therefore would have standing to challenge FERC's orders, such that it would be unfair to let FERC argue now that Adirondack lacks standing because it has suffered no injury.

Assuming *arguendo* that FERC conceded Adirondack's interest in the proceedings, a point on which we express no view, we nonetheless have "an independent obligation" to conduct our own standing inquiry. *Kendall v. Employees Ret. Plan of Avon Prods.*, 561 F.3d 112, 117 n.11 (2d Cir. 2009). And although we recognize that a party's standing can be predicated on an injury to aesthetic, environmental, or recreational interests, *see, e.g.*, *Friends of the Earth, Inc.*, 528 U.S. at 183-84; *LaFleur*, 300 F.3d at 270–71, Adirondack offers no support for its assertion that it has suffered any such injury as a result of any of FERC's orders.

Second, Adirondack asserts that it has an interest, in its capacity as the development subsidiary of Albany Engineering ("Albany"), in the general development of hydroelectric projects on the Mohawk and Hudson Rivers in the vicinity of the School Street Project. But this argument is to no avail. As an initial matter, although Adirondack states that Albany has initiated licensing proceedings for a project on the Mohawk River upstream from the School Street Project, it makes no argument that this project would be impacted in any way by the relicensing of School Street. Furthermore, any potential injury that might result from Adirondack's purported interest in developing future hydroelectric projects on the Mohawk River is far too hypothetical to establish standing, because that injury would be dependent upon (1) Adirondack actually pursuing those projects, and (2) the School Street Project affecting their

development. *See Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003) ("[T]o support standing, the plaintiff's injury must be actual or imminent to ensure that the court avoids deciding a purely hypothetical case in which the projected harm may ultimately fail to occur.").

Third, Adirondack asserts that it has an interest that derives from the development of the Cohoes Falls Project. Its argument proceeds as follows: Albany is Green Island's agent and primary consultant with respect to the Cohoes Falls Project and thus stands to profit by doing work for Green Island on that project. As a subsidiary of Albany, Adirondack stands to earn profits as a result of the work that Albany will perform. If FERC relicenses the School Street Project, however, Green Island cannot develop the Cohoes Falls Project. This will have a financial impact on Albany, which, in turn, will cause economic harm to Adirondack.

Adirondack's argument, however, suffers from two flaws. The first is that Adirondack's purported injury derives from Albany's financial injury. Although it is settled law that a party can establish standing even if it has suffered only an indirect injury, *see Warth v. Seldin*, 422 U.S. 490, 504-05 (1975), that does not relieve that party from establishing that it actually will suffer a concrete injury. In this case, Albany's injury is purely speculative. If School Street were not licensed, then Albany would stand to profit from its relationship with Green Island only if (1) Green Island carried through with its stated intention of filing a license application for the Cohoes Falls Project, (2) Green Island continued to use Albany as a consultant on that project, and (3) work needed to be performed by Albany as Green Island competed for that license. Because Albany's injury is speculative, Adirondack's purported injury necessarily is speculative as well.

But even assuming *arguendo* that Albany would suffer a non-hypothetical injury as a

23

result of the licensing order, Adirondack fails to explain the mechanism by which injury would flow to it.  Indeed, although Adirondack asserts that it stands to profit from the Cohoes Falls Project because it is a subsidiary of Albany, it cites no authority to support the proposition that a subsidiary necessarily suffers financial injury whenever its parent suffers economic harm.[9]  Nor does Adirondack identify any facts or characteristics unique to this particular parent-subsidiary relationship that could lead us to the conclusion that Adirondack will suffer an injury if Albany suffers an injury.

In sum, none of the injuries identified by Adirondack are sufficient to satisfy the injury-in-fact requirement of the standing analysis.  Consequently, Adirondack lacks standing to challenge any of FERC's orders.

### 2.     Green Island

Green Island was not permitted to intervene as a party in the relicensing proceedings.  As discussed above, however, it is a party for the limited purpose of challenging FERC's denial of its motion to intervene.  Furthermore, Green Island has standing to challenge FERC's order denying its motion to intervene and its order denying rehearing of that order.  *See City of Orrville*, 147 F.3d at 989–90 n.12; *Covelo Indian Cmty.*, 895 F.2d at 585-86.  Accordingly, we now consider Green Island's petition for review of FERC's denial of its motion to intervene, and FERC's denial of Green Island's request for rehearing of that decision.

---

[9] Adirondack's reliance on *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 258 (2d Cir. 1989), here is misplaced.  In *Consolidated Gold Fields*, a case arising in the antitrust context, we held that a subsidiary of a hostile takeover target had standing to seek an injunction against the tender offer because the takeover bid would cause the subsidiary itself to suffer "curtailment of its production," which in turn would lead to reduction in its profits and in its ability to compete.  *Id.*  Thus, the subsidiary had standing not because it was a subsidiary of a parent that suffered an injury, but rather because it suffered an injury *itself*.

24

C.    Green Island's Motion to Intervene

As it did before the agency, Green Island argues here that FERC disregarded its obligation to solicit motions to intervene at three points during the relicensing proceedings: (1) in December 1995, when Niagara Mohawk informed FERC that it no longer intended to install the proposed 21-MW generator; (2) in May 2001, when Erie reversed course and informed FERC that it intended to install the proposed 21-MW generator; and (3) in March 2005, when Erie submitted the Offer of Settlement. Green Island contends that because FERC failed to solicit interventions at any of these three points, its treatment of Green Island's motion to intervene as untimely was arbitrary and capricious.

Under the regulations governing relicensing proceedings, upon the filing of a material amendment to a new license application, FERC must reissue public notice of that application, along with dates for comments, intervention, and protests. *See* 18 C.F.R. § 16.9(b)(3), (d)(1). A "material amendment to plans of development proposed in an application for a license . . . means any fundamental and significant change, including but not limited to . . . [a] change in the installed capacity, or the number or location of any generating units of the proposed project if the change would significantly modify the flow regime associated with the project." 18 C.F.R. § 4.35(f)(1)(i).

FERC did not view any of the events identified by Green Island as warranting the solicitation of motions to intervene. Specifically, it determined that the 1995 and 2001 events did not constitute materials amendments to the license application because they did not "significantly affect the project's flow regime." *September 21 Order Denying Rehearing*, 120 F.E.R.C. ¶ 61,267, at 62,184–85. It determined that the 2005 Offer of Settlement did not warrant

25

intervention for three reasons: (1) it "supplement[ed] rather than supersede[d] the license application"; (2) it did not "significantly affect interests in a manner not contemplated by the original application"; and (3) it fell under one of the exceptions to the intervention requirements contained in 18 C.F.R. § 4.35(e). *See id.* at 62,185–86 & n.26. Consequently, FERC analyzed Green Island's motion pursuant to the factors governing its consideration of late motions to intervene. *See* 18 C.F.R. § 385.214(d).

FERC's factual findings underlying its conclusion that the 1995 and 2001 events did not constitute material amendments to the license application because they did not "significantly modify the project's flow regime" are supported by substantial evidence. *See Friends of the Ompompanoosuc v. FERC*, 968 F.2d 1549, 1554 (2d Cir. 1992) ("'Substantial evidence' has been defined to mean such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (internal quotation marks omitted)). With respect to the removal of the generator from consideration in 1995, FERC recognized that this "would result in a change in flows, because more water would spill over the dam whenever flows available for generation exceeded the capacity of the existing turbines." *September 21 Order Denying Rehearing*, 120 F.E.R.C. ¶ 61,267, at 62,184. It concluded, however, that this would not *significantly* affect the project's flow regime because "the project would still be required to operate in a run-of[-]river mode, and to provide the same minimum flows in the bypassed reach." *Id.* FERC referenced this same reasoning when it concluded that the 2001 reinstatement of the 21-MW generator did not constitute a material amendment. Although Green Island criticizes FERC's reasoning as "illogical" and "nonsense," it offers no actual evidence to demonstrate that FERC's conclusion was flawed. Consequently, FERC's decisions not to solicit motions to intervene in 1995 or 2001

26

were not arbitrary and capricious.[10]

FERC's decision not to solicit motions to intervene following the March 2005 Offer of Settlement, however, was arbitrary and capricious. *See LaFleur*, 300 F.3d at 267. Section 16.9(b)(3) of its regulations requires FERC to reissue public notice and seek comments, interventions, and protests, if an applicant for a new license "materially amends" its application as that term is defined in 18 C.F.R. § 4.35(f)(1). Thus, the analysis that FERC should have performed at that time required it to consider solely whether the Offer of Settlement constituted a "fundamental and significant change" to the School Street license application. *See* 18 C.F.R. § 4.35(f)(1). FERC did not address this question. Rather, it relied on two grounds – that (1) settlement agreements generally supplement rather than supersede license applications, and (2) the Offer of Settlement did not "significantly affect interests in a manner not contemplated by the original application" – that have no bearing on the analysis.

FERC's third reason for not soliciting motions to intervene in 2005 – that the Offer of Settlement fell under one of the exceptions in 18 C.F.R. § 4.35(e) – similarly was improper. On the surface, § 4.35(e) would appear to be applicable. As a general matter, § 4.35 governs how to determine the date of acceptance of a license application when that application has been amended. *See* 18 C.F.R. § 4.35(a) ("[I]f an applicant amends its filed application as described in paragraph (b) of this section, the date of acceptance of the application under § 4.32(f) is the date

---

[10] In any event, even if FERC's decisions not to solicit motions to intervene in 1995 or 2001 were arbitrary and capricious, any resulting error would have been harmless vis-à-vis Green Island, because (1) the 1995 events occurred prior to the time when Green Island developed an interest in the proceedings, and (2) Green Island has not alleged that it would have filed a motion to intervene in 2001, as opposed to waiting until 2004, had FERC solicited interventions at that time.

27

on which the amendment to the applica[tion] was filed."). The regulation applies when, for example, the applicant "[a]mends its filed license . . . application . . . to materially amend the proposed plans of development."[11] *Id.* § 4.35(b)(1). In that event, the application is considered "a new filing for . . . [t]he purpose of determining its timeliness under § 4.36 of this part . . . and . . . [r]eissuing public notice of the application under § 4.32(d)(2)." *Id.* § 4.35(c).

Section 4.35(e) creates exceptions to the operation of § 4.35(a) where, *inter alia*, the amendment is "made by a license . . . applicant to its proposed plans of development to satisfy requests of resource agencies." *Id.* § 4.35(e)(4). Thus, when an applicant amends a license application in response to a request from a resource agency, that amendment has no impact on the date on which the application is deemed to have been filed. Moreover, § 4.35(e) appears to indicate that FERC does not have to reissue public notice of the application, even if the amendment to that application is material.

In the present context, however, that of a relicensing proceeding, § 4.35 is not the appropriate regulation upon which to rely. Rather, FERC should have conducted its analysis pursuant to the requirements of § 16.9, which "applies to an applica[tion] for a new license or nonpower license for a project subject to sections 14 and 15 of the Federal Power Act." 18 C.F.R. § 16.9(a). Indeed, § 16.9(b)(3) explicitly provides that "[t]he requirements of § 4.35 of this chapter do not apply to an application under this section, except that the Commission will reissue a public notice of the application in accordance with the provisions of § 16.9(d)(1) if an amendment described in § 4.35(f) of this chapter is filed." In other words, in relicensing proceedings FERC may look to § 4.35 only for its definition of "material amendment"; FERC

---

[11] As discussed above, the term "material amendment" is defined in § 4.35(f).

must reissue public notice and set a date for comments, intervention, and protests *any time* an applicant for a new license materially amends its license application.

The administrative history of § 16.9(b)(3) supports our understanding of the role § 4.35 plays in relicensing proceedings and demonstrates that FERC's interpretation of that regulation is unreasonable. In setting forth its final rule with respect to hydroelectric relicensing regulations under the FPA, FERC explained that § 4.35 was not relevant to the filing of amendments to new license applications, except insofar as that section is to be used to determine whether such amendments are material.

> Under § 4.35, when amendments to applications that are considered as "material" are filed, the filing date of the initial application is deemed to be the date the material amendment is filed for a variety of purposes, including the determination of whether the initial application was timely filed vis-a-vis competition deadlines. On its face, § 4.35 applies to relicensing proceedings. However, application of § 4.35 to relicensing proceedings would mean that an application for new license timely filed by an applicant prior to the 24-month new license filing deadline would be rejected if the applicant were to file a material amendment to the application after the 24-month deadline, even if the amendment were filed prior to the final amendment deadline established for the proceeding.
>
> The Commission believes it is appropriate to waive § 4.35 as to relicensing proceedings to avoid this situation. . . . However . . . , the § 16.9(d)(1) notice will be reissued to obtain the views of the public and others should an amendment considered material under § 4.35(f) be filed.

Hydroelectric Relicensing Regulations Under the Federal Power Act, 54 Fed. Reg. 23,756, 23,787 (June 2, 1989) (footnotes omitted).

It is plain, therefore, that FERC's decision not to solicit motions to intervene following the submission of the Offer of Settlement was predicated on three reasons not contemplated by

29

its regulations.[12]  Furthermore, its failure to conduct the proper analysis may have affected its treatment of Green Island's motion to intervene.  Had FERC determined that the Offer of Settlement *was* a material amendment, then it would have been required to solicit interventions, Green Island's renewed motion to intervene would have been timely, and FERC could not have analyzed that motion pursuant to the factors applicable to untimely motions to intervene. Consequently, FERC's denial of Green Island's motion to intervene, without first conducting the proper analysis to determine whether it was required to solicit such motions, was arbitrary and capricious.

## D.      Prejudicial Error Analysis

Although we find that FERC acted arbitrarily and capriciously by denying Green Island's motion to intervene without first considering whether the Offer of Settlement materially amended the School Street license application, we are mindful of the Administrative Procedure Act's admonition that "due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706; *see Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007).  "The rule of prejudicial error typically eliminates the necessity of remand following judicial review when the error that the agency has made was not prejudicial and did not impinge on fundamental rights." *N.Y. Pub. Interest Research Group v. Whitman*, 321 F.3d 316, 333 (2d Cir. 2003) (emphasis omitted).  Thus, we will not disturb FERC's orders if we can determine that the outcome of the administrative proceedings will be the same absent FERC's error.  *See PDK Labs. Inc. v. U.S.*

---

[12] As discussed above, those three reasons were that the Offer of Settlement (1) "supplement[ed] rather than supersede[d] the license application," (2) did not "significantly affect interests in a manner not contemplated by the original application," and (3) fell under one of the exceptions to the intervention requirements contained in 18 C.F.R. § 4.35(e).  *September 21 Order Denying Rehearing*, 120 F.E.R.C. ¶ 61,267, at 62,185–86 & n.26.

*Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration."); *see also Kerner v. Celebrezze*, 340 F.2d 736, 740 (2d Cir. 1965) ("It would be fatuous to suppose that if the hearing officer had recommended a decision in [petitioner's] favor, the ultimate result would have been different, or that a remand to obtain a recommendation from him now would accomplish anything save further expense and delay." (citation omitted)). If, however, we can determine that the outcome will be different, or if there is uncertainty with respect to what the outcome will be, when FERC properly applies its regulations, then we will find that FERC's error was prejudicial and remand the case for further proceedings. *See Sprint Corp. v. FCC*, 315 F.3d 369, 376 (D.C. Cir. 2003); *cf. Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) ("[A]n utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure.").

Our prejudicial error analysis first must address whether we can determine that FERC will deny Green Island's motion to intervene upon remand, even after conducting the proper analysis. If so, there can be no prejudicial error. If not, however, then we must address whether we can determine that FERC will license the School Street Project again, even if it grants Green Island's motion to intervene.

Turning to the first part of the analysis, we cannot be certain that FERC will deny Green Island's motion to intervene after applying its regulations properly, because FERC has never addressed whether the extensive proposals contained in the Offer of Settlement materially amended the School Street license application, and we lack the expertise to make this

determination in the first instance. Furthermore, FERC has never given any indication that it would have denied Green Island's motion to intervene even if it had considered that motion to be timely. We therefore must consider the second prong of our prejudicial error analysis – i.e., whether the outcome of the administrative proceedings will be the same even if Green Island is permitted to intervene.

We are unable to conclude that the outcome of the proceedings will be the same upon remand if Green Island is permitted to intervene. During the proceedings below, FERC steadfastly refused to consider the evidence that Adirondack and Green Island submitted regarding the Cohoes Falls Project proposal. As we explain below, however, FERC has a statutory duty when conducting relicensing proceedings to consider feasible alternatives to the project under consideration, even if it ultimately cannot license those alternatives. Consequently, if Green Island is permitted to intervene upon remand, then FERC is statutorily obligated to consider its evidence regarding the Cohoes Falls Project.

This statutory duty arises principally from three sections of the FPA. As an initial matter, § 4(e) grants FERC the authority to issue licenses for hydroelectric projects, but it demands that FERC consider a broad spectrum of concerns:

> In deciding whether to issue any license under this subchapter for any project, the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality.

16 U.S.C. § 797(e).

Section 10(a)(1) of the FPA, which covers the issuances of licenses generally, provides

32

that

> the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be *best adapted to a comprehensive plan* for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial public uses.

16 U.S.C. § 803(a)(1) (emphasis added). When the FPA was amended in 1986, Congress recognized that "[FERC] and the courts have held the Section 10(a) standard to be [a] broad public interest standard, requiring consideration of all factors affecting the public interest." H.R. Rep. No. 99-507, at 12 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 2496, 2499. Further, Congress explained that it intended § 10(a) to provide FERC with the flexibility to weight different public-interest factors differently on a case-by-case basis, so that "[a]s the public interest changes over time, [FERC's] considerations under the section 10(a) standard likewise change, encompassing new criteria or reevaluating the weight given established criteria." *Id.* Section 10(a) does not present "an exclusive list of values FERC must evaluate and address," but rather "highlights the steps the Commission must take to inform itself regarding the needs and uses of the river in question." H.R. Rep. No. 99-934, at 22 (1986) (Conf. Rep.), *as reprinted in* 1986 U.S.C.C.A.N. 2537, 2539.

Section 15(a)(2) of the FPA mandates a similar analysis with respect to applications for new licenses. It provides that

> [a]ny new license issued under this section shall be issued to the applicant having the final proposal which the Commission determines is *best adapted to serve the public interest*, except that in making this determination the Commission shall ensure that insignificant differences with regard to subparagraphs (A) through (G) of this paragraph between competing applications are not determinative and shall

not result in the transfer of a project. In making a determination under this section (whether or not more than one application is submitted for the project), the Commission shall, in addition to the requirements of section 803 of this title, consider (and explain such consideration in writing) each of the following . . . .

16 U.S.C. § 808(a)(2) (emphasis added). The statute then enumerates seven factors that FERC "shall . . . consider" when determining whether the project is "best adapted to serve the public interest." *See* 16 U.S.C. § 808(a)(2)(A)-(G); *see also* 18 C.F.R. § 16.13(a) ("In determining whether a final proposal for a new license under section 15 of the Federal Power Act is best adapted to serve the public interest, the Commission will consider the factors enumerated in sections 15(a)(2) and (a)(3) of the Federal Power Act.").

The purpose of § 15(a)(2) is to ensure that FERC rigorously scrutinizes any application for a new license for an existing hydroelectric project, so that it can determine that the existing project is "best adapted to serve the public interest." This is so even where there is only one applicant and that applicant is the current license holder of the existing project. Indeed, the legislative history noted explicitly that a relicensing proceeding "does not include an incumbent preference," H.R. Rep. No. 99-934, at 26, and that the "existing licensee will not be 'rubber stamped,' but must again prove that its project qualifies as 'best adapted' on power and non-power grounds." H.R. Rep. 99-507, at 15; *see also id.* at 33-35 (discussing the importance of a rigorous evaluation of all license applications to ensure that each is best adapted to serve the public interest).

Sections 10 and 15 of the FPA place great emphasis on the requirement that FERC license the hydroelectric project "best adapted" to accomplish the goals of the statute. We explained what FERC must do to comply with the "best adapted" standard under § 10(a) when

34

we decided *Scenic Hudson Preservation Conference v. FPC*, 354 F.2d 608 (2d Cir. 1965).[13]  In

*Scenic Hudson*, we reviewed, *inter alia*, an order issued by the FPC granting a license to

Consolidated Edison ("Con Ed") to construct a hydroelectric project near the Hudson River.  *Id.*

at 611.  We stated that the project could be licensed only if it met the statutory requirement that it

be "'best adapted to a comprehensive plan for improving or developing a waterway,'" *id.* at 612

(quoting 16 U.S.C. § 803(a)), and that the FPC was "under a statutory duty to give full

consideration to alternative plans," even where it "'ha[d] no authority to command the

alternative.'"  *Id.* at 617 (quoting *City of Pittsburgh v. FPC*, 237 F.2d 741, 751 n.28 (D.C. Cir.

1956)).

We found that the FPC had violated this duty when it refused to receive testimony

concerning the feasibility of an alternative to the Con Ed project, on the ground that the

testimony was not timely.  We remanded the case for the agency to supplement its record,

concluding that "[e]specially in a case of this type, where public interest and concern is so great,

the Commission's refusal to receive the . . . testimony, as well as proffered information on fish

protection devices and underground transmission facilities, exhibits a disregard of the statute and

of judicial mandates instructing the Commission to probe all feasible alternatives."  *Id.* at 620

(footnote omitted).  Finally, we admonished the agency that

---

[13] Because *Scenic Hudson* was decided before Congress amended the FPA in 1986, and before it passed the National Environmental Policy Act of 1969 ("NEPA"), FERC questions the extent to which our decision in that case continues to apply to licensing proceedings today.  At oral argument, FERC softened its position vis-à-vis NEPA, and the legislative history of the 1986 amendments to the FPA makes plain that Congress intended those amendments to reflect how courts had interpreted the "best adapted" standard in the past.  *See* H.R. Rep. No. 99-934, at 21 ("There is no intention in any way to change the holdings in relevant cases, . . . which the conferees intend will continue to apply to FERC's hydroelectric program.").  Thus, *Scenic Hudson* continues to apply to licensing proceedings today.

the Commission has claimed to be the representative of the public interest. This role does not permit it to act as an umpire blandly calling balls and strikes for adversaries appearing before it; the right of the public must receive active and affirmative protection at the hands of the Commission. . . . The Commission must see to it that the record is complete. The Commission has an affirmative duty to inquire into and consider all relevant facts.

*Id.*

*Scenic Hudson* makes plain that FERC is statutorily obligated, pursuant to the "best adapted" standard set forth in sections 10 and 15 of the FPA, to give full consideration to all feasible alternatives, even where it ultimately cannot license those alternatives. We recognize that FERC must strike a balance between complying with this obligation and ensuring the timely resolution of licensing proceedings. Given the unique circumstances of this case, however, where more than fifteen years passed between when Niagara Mohawk first submitted its application for a new license for the School Street Project in December 1991 and when FERC issued its licensing order in February 2007, and where nearly two years passed between the filing of the Offer of Settlement and the licensing order, FERC's compliance with its statutory obligation bears particular importance.

Thus, if Green Island is permitted to intervene upon remand, FERC must consider Green Island's evidence regarding the Cohoes Falls Project so that it may determine whether the Cohoes Falls Project is a feasible alternative. If FERC determines that the Cohoes Falls Project *is* a feasible alternative, then it must give it full consideration when determining whether the School Street Project satisfies the "best adapted" standard of the Federal Power Act, notwithstanding the fact that FERC cannot license the Cohoes Falls Project instead of School

Street.[14]  Because FERC has never considered the Cohoes Falls Project proposal in any detail and, indeed, has conceded that it has no way of knowing whether that proposal has any merit, *see September 21 Order Denying Rehearing*, 120 F.E.R.C. ¶ 61,267, at 62,190, we are unable to determine what the outcome of this analysis might be.  Therefore, we cannot be certain that FERC's error in denying Green Island's motion to intervene was harmless.

In sum, FERC abused its discretion when it denied Green Island's motion to intervene without first considering whether the Offer of Settlement materially amended the School Street license application.  Furthermore, we are unable to conclude that this error was not prejudicial. Accordingly, we remand this case for FERC to consider in the first instance whether the Offer of Settlement was a material amendment to the license application.  If it was, then FERC must consider Green Island's motion to intervene in the relicensing proceedings as timely filed and analyze it accordingly.  In the event that it grants Green Island's motion to intervene, FERC is statutorily obligated to consider Green Island's evidence regarding the Cohoes Falls Project proposal.

## CONCLUSION

For the foregoing reasons, we DENY Adirondack Hydro Development Corporation's petitions for review.  We GRANT Green Island Power Authority's petitions for review of the orders denying its motion to intervene and denying its request for rehearing of that decision.  We VACATE the Federal Energy Regulatory Commission's February 15, 2007 order issuing a new license for the School Street Hydroelectric Project and REMAND this case for further proceedings consistent with this opinion.

---

[14] We leave it for FERC to determine in the first instance whether, in the event it determines that the Cohoes Falls Project does present a feasible alternative, it is required to conduct further analysis to comply with its statutory obligations under NEPA.